(No. 46146.—

ILLINOIS STATE EMPLOYEES ASSOCIATION *et al.*, Appellants, v. DANIEL WALKER, Governor, *et al.*, Appellees and Cross-Appellants.

*Opinion filed July 1, 1974.*

RYAN and GOLDENHERSH, JJ., dissenting.

William S. Hanley, of Sorling, Catron and Hardin, of Springfield, for appellants Illinois State Employees Association *et al.*

Edward G. Coleman, of Springfield, for appellants Trooper Lodge No. 41, Fraternal Order of Police.

William J. Scott, Attorney General, of Springfield (George E. Preonas, Special Assistant Attorney General, and Thomas H. Price, Jr., Assistant Attorney General, of counsel), for appellees and cross appellants.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Three separate actions in the circuit court of Sangamon County were consolidated. Each action challenged the validity of the Governor's Executive Order No. 4 of February 27, 1973, and the financial disclosure statement prepared by the Board of Ethics pursuant to that order. In one case the plaintiffs are individual State employees and the Illinois State Employees Association; in another, individual highway engineers and the Illinois Association of Highway Engineers; and in the third, individual members of the State Highway Police, and Trooper Lodge No. 41, Fraternal Order of Police. Each action purports to be brought in behalf of the named plaintiffs and all employees similarly situated. The defendants in each action are Governor Daniel Walker, Abner J. Mikva, Chairman of the Illinois Board of Ethics, and George M. Burditt, a member of the Illinois Board of Ethics. Since the individuals named as plaintiffs in each action have standing to maintain it, it is unnecessary to inquire into the standing of the plaintiff associations to represent their individual members in these actions.

The trial court heard evidence and entered a judgment sustaining the overall validity of the order and the financial disclosure statement prepared by the Board, but holding that certain portions of the statement were invalid. Both parties appealed, and the appeal was brought to this court pursuant to Rule 302(b).

Executive Order No. 4 created a Board of Ethics, whose members were to serve without compensation. The order provided that the Board should have jurisdiction "over each agency whose vouchers are subject to the approval of the Department of Finance," and it further provided:

> "3. At the commencement of state service and thereafter between April 15 and April 30 of each succeeding year, each of the following persons in each agency

subject to the jurisdiction of the Board shall file with the Board a sworn Statement of Economic Interest and a copy of his most recent federal and state income tax returns:

a. Each person appointed by the Governor;
b. Each person who receives $20,000 or more per year from the State; and
c. Each other person whose position is subject to undue influence (as determined from time to time by rule of the Board).

4. The Statement of Economic Interest shall contain:
   a. A current net worth statement, disclosing all assets and liabilities of the person;
   b. A statement of income (including capital gains) received by the person during the preceding calendar year, disclosing:
      (1) each source of income,
      (2) the total amount received from the source, and
      (3) the nature of the income transactions involving the source.
      To provide this information, pertinent portions of federal or state income tax returns shall be made part of the Statement of Economic Interest;
   c. A statement of gifts received by the person during the preceding calendar year, disclosing all gifts from any source having business with or regulated by the agency of the person and all gifts of a value of $50 or more from sources other than members of the person's family;
   d. A statement of close economic associations, indicating the person's position with each business or professional entity with which the person is associated as an officer, employee, director or partner or in which he has a substantial interest and identifying those entities which derive substantial income from the State or from professional engagements concerning the State.

5. The Statement of Economic Interest of each person other than one appointed from the public to serve on a Board or Commission shall be open to reasonable public inspection. The Board shall provide by rule for the time, place and manner of inspection.

6. Subject to rule of the Board, the Statement of Economic Interest shall disclose interests of the spouse and immediate family living with the person making the statement."

The order further provided that a false or misleading statement, or failure to file on time or to cooperate with the Board would be ground for disciplinary action, including discharge. The order directed the Board to review the documents filed with it, to make investigations and to report to the Governor upon finding an apparent conflict of interest or other impropriety.

The plaintiffs have attacked the executive order upon many grounds. We consider first those which relate to the power of the Governor to promulgate the order. The plaintiffs first contend that the "order is an unconstitutional usurpation of legislative power." This argument is difficult to comprehend. It seems to be based upon notions of separation of powers radiating from the opinion in *Field v. People ex rel. McClernand* (1839), 2 Scam. (3 Ill.) 79, which involved an effort by the then Governor to remove from office the Secretary of State whom he had appointed with the advice and consent of the Senate. So far as questions of that kind may be involved, or thought to be involved, in this case, the Constitution of 1970 provides in section 10 of article V: "The Governor may remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor." Section 12 of article V of the Constitution of 1870 was to the same effect. See *Wilcox v. People ex rel. Lipe* (1878), 90 Ill. 186, 198.

The plaintiffs then argue:

"[T]he legislature has already acted in the passage of the Illinois Governmental Ethics Act and its action has been approved by this Court. *Stein v. Howlett,* 52 Ill.2d 570, 289 N.E.2d 409, (1972). Moreover, the legislature has specifically provided for the conditions upon which a person in public service may be disciplined or discharged.

The Illinois Personnel Code, 1971 Ill. Rev. Stat. Ch. 127, Sec. 63(b) 101, et seq. provides that candidates for employment or eligibility under the Code may be rejected by the Director of Personnel only on certain conditions."

It is then asserted that by the executive order the Governor "has rewritten the Personnel Code of Illinois and the Illinois State Police Act and even the Illinois Governmental Ethics Act to impose a new condition of employment in State Government."

These somewhat strident contentions overlook some relevant considerations. Article 5 of the Illinois Governmental Ethics Act, which became effective January 1, 1968, authorized the Governor and each elected State officer in the executive department to promulgate detailed codes of conduct for appointed officers and employees under their jurisdiction (Ill. Rev. Stat. 1971, ch. 127, par. 605—101 *et seq.*), and executive orders applicable to employees in the executive branch had been adopted by Governors Kerner and Ogilvie. Article 5 was no longer necessary, however, after the Constitution of 1970 became effective, and it was repealed by Public Act 77—1806, effective January 24, 1972. (See Ill. Rev. Stat. 1973, ch. 127, par. 605—101 *et seq.*) Since then, the source of authority of the executive branch with respect to ethical standards and statements of economic interests has been section 2 of article XIII, which provides:

"SECTION 2. STATEMENT OF ECONOMIC INTERESTS

All candidates for or holders of state offices and all members of a Commission or Board created by this Constitution shall file a verified statement of their economic interests, as provided by law. The General Assembly by law may impose a similar requirement upon candidates for, or holders of, offices in units of local government and school districts. Statements shall be filed annually with the Secretary of State and shall be available for inspection by the public. The General Assembly by

law shall prescribe a reasonable time for filing the statement. Failure to file a statement within the time prescribed shall result in ineligibility for, or forfeiture of, office. This Section shall not be construed as limiting the authority of any branch of government to establish and enforce ethical standards for that branch." Ill. Const. (1970), art. XIII, sec. 2.

The plaintiffs also contend that the executive order is invalid because it was not submitted to the General Assembly before it became effective. This contention is based upon section 11 of article V, which authorizes the Governor to "reassign functions among or reorganize executive agencies which are directly responsible to him." The section continues: "If such a reassignment or reorganization would contravene a statute, the Executive Order shall be delivered to the General Assembly." The plaintiffs do not identify any statute that they contend has been contravened by the order, and we are aware of none. The authority of the Governor to adopt this order is granted by section 2 of article XIII, which has been set forth.

It is also contended by the plaintiffs that the provision of the order which made its requirements applicable only to agencies whose vouchers are approved by the Department of Finance constitutes a denial of equal protection in violation of the fourteenth amendment of the Federal Constitution. We do not agree. Section 10 of "An Act in relation to State finance" (Ill. Rev. Stat. 1973, ch. 127, par. 137 *et seq.*) establishes a system for controlling State expenditures. Code departments, and all boards and agencies, with certain exceptions, may not draw funds from the State treasury unless their vouchers have been approved by the Department of Finance. (Ill. Rev. Stat. 1973, ch. 127, par. 146.) It is unnecessary to analyze each of the agencies excepted in section 10 and elsewhere, other than to note that several are quasi-independent bodies performing certain special functions. We consider that there exists here a rational classification consistent with the purposes of the order.

It is further contended that the classification of persons subject to the order is otherwise vague and indefinite and violated the plaintiffs' rights to due process of the law and equal protection of the laws. The persons subject to the order are:

"a. Each person appointed by the Governor;
 b. Each person who receives $20,000 or more per year from the State; and
 c. Each other person whose position is subject to undue influence (as determined from time to time by rule of the Board)."

Those persons appointed by the Governor, and those receiving more than $20,000 per year from the State are readily identifiable and these categories appear to embrace that relatively small percentage of all employees of the State who occupy the most responsible positions. For example, of more than 22,000 employees of the Department of Mental Health, about 500 are within the scope of the order.

The third group consists of any "other person whose position is subject to undue influence (as determined from time to time by rule of the Board)." As we understand the position of the plaintiffs, they do not challenge the validity of this aspect of the executive order. It is rather their position that the Board of Ethics acted improperly in formulating its rule. What the Board did was to request heads of each of the departments and agencies involved to indicate those persons in that department or agency whose positions are subject to conflict of interest.

This procedure was adopted pursuant to Rule 2 of the Board, which provides:

"Each official having supervisory control over agencies subject to the jurisdiction of the Board of Ethics shall report to the Board of Ethics initially by April 30, 1973, and yearly thereafter no later than March 15, the names and titles of all employees who in the judgment of the official are required by the Governor to file a Financial Disclosure Statement pursuant to the Governor's Execu-

tive Order. The Board of Ethics shall review the names and positions recommended for filing by each official to determine the names of those who must file. ***"

Under this procedure the Board was not surrendering its power and responsibility for the ultimate decision as to what positions were to be regarded as subject to undue influence. The role of the agency head was to make a recommendation, a role which would necessarily require a knowledge of the agency's operations which, initially at least, the agency head, rather than the Board, would be most likely to possess. The agency recommendation, however, remains merely a recommendation; the decision remains that of the Board.

Rule 3 of the Board provides moreover that any employee who is requested to file a financial disclosure statement may object "by submitting to the Board of Ethics in writing a statement that he or she is not in any category of personnel required to file Financial Disclosure Statements under Executive Order No. 4, together with such supporting documents as he or she deems necessary. The Board will notify each such person, in writing, of its decision on the objection. If the Board rejects the objection, the person will be required to file his Financial Disclosure Statement within two weeks of the date on which the objection was rejected or the date on which such statement would otherwise have been due, whichever is later. The due date for filing the Financial Disclosure Statement shall be included in the notice of rejection." The record shows that objections were filed by some employees, but that because of the issuance of a preliminary injunction in this case, the objections have not as yet been ruled upon. In our opinion, the Board pursued a reasonable course in permitting those having supervisory authority to make the initial determination as to the vulnerability of particular positions, subject to specific review by the Board. We hold that the rights of any affected person to due process of law or to equal

protection of the law have not been violated by the procedure employed.

The plaintiffs appear to rely upon section 6 of article I of the Illinois Constitution of 1970 as creating a right of privacy in them with respect to disclosure of their economic interests. We referred to that constitutional provision in *Stein v. Howlett* (1972), 52 Ill.2d 570, 574, observing, "No limiting definition of the type of privacy is stated in the constitution." Upon further consideration of the language of section 6 and the history of its adoption, we would now qualify that observation.

Section 6 provides: "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." The changes from the Constitution of 1870 are first, that the word "possessions" is substituted for the word "effects," and second, that the phrase "invasions of privacy or interceptions of communications by eavesdropping devices or other means" is added to the protections against unreasonable searches and seizures. As the section was initially reported to the Constitutional Convention by its Bill of Rights Committee, an argument could have been made that it established an independent right of privacy rooted in the State Constitution, apart from or in addition to the common law right of privacy recognized in *Leopold v. Levin* (1970), 45 Ill.2d 434. During its progress through the Constitutional Convention, however, the provision was altered so that as submitted to and approved by the people it was restricted in the manner indicated above. The original form of the provision, together with added material shown by underscoring and stricken material by printing and striking, was as follows:

"The people shall have the right of the people to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of

privacy or interceptions of ~~their~~ communications by eavesdropping devices or other means~~, or invasions of their privacy shall not be violated, and~~ No warrant shall issue without probable cause, supported by affidavit, particularly describing the place to be searched~~,~~ and the persons or things to be seized." (6 Record of Proceedings, Sixth Illinois Constitutional Convention 210 (hereafter Proceedings).)

Not all members of the court are convinced that this provision should be interpreted as asserting anything beyond protection from invasions of privacy by eavesdropping devices or other means of interception.

But if any doubt exists as to the ultimate meaning of section 6, it is dispelled, insofar as this case is concerned, by the proceedings of the Convention. A major effort was there made to strike section 2 of article XIII, which authorizes economic disclosures, on the precise ground that it would authorize an invasion of a constitutional right of privacy. The proposed amendment was based upon the decision of the Supreme Court of California in the case of *City of Carmel-By-The-Sea v. Young* (1970), 2 Cal. 3d 259, 466 P.2d 225, 85 Cal. Rptr. 1, a case which also formed one of the major foundation stones of the plaintiffs' argument in the present case. The amendment was fully debated and was rejected by a two-to-one vote of the Convention delegates. (See 3 Proceedings 1800-1804.) This court refused to follow the *City of Carmel* case in *Stein v. Howlett,* 52 Ill.2d at 578.

The notion that a person's ownership of property, real or personal, lies somehow within a protected zone of privacy, is new. For more than a hundred years the revenue acts of this State have provided, and they still provide, that schedules for the listing, under oath, of personal property for tax purposes shall be furnished to each person owning property subject to taxation. (Ill. Rev. Stat. 1973, ch.120, par. 530.) The property subject to taxation includes all tangible personal property as well as "[a]ll moneys, credits, bonds or stocks and other invest-

ments ***." (Ill. Rev. Stat. 1973, ch. 120, par. 499.) This provision is a continuation of the Revenue Act of 1872.

Both the language of section 2 of article XIII of the Constitution of 1970, and the history of its enactment, require that we reject the notion that the Illinois Constitution of 1970 created a right of privacy which restricts action by the legislative, executive or judicial branches of government with respect to the disclosure of economic interests by State officers and employees.

We come, then, to the contention that the executive order and the rules of the Board of Ethics are invalid because the Constitution of the United States gives to officers and employees of the State of Illinois the right to withhold information relating to their economic interests and their incomes.

For this proposition the plaintiffs rely heavily upon *Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678, which involved legislation relating to the use of contraceptives. They argue: "If, in *Griswold,* the State could not invade the zone of privacy that a married couple may enjoy on top of the mattress, we might well question what right the State has to invade the zone of privacy that a married couple might enjoy in what they have tucked inside the mattress." In our opinion this argument debases the *Griswold* opinion, and we find it completely unacceptable. We do not deal in this case with the most intimate relationships of husband and wife or with an effort by the State to control their decisions as to whether and when to have their children. We deal rather with a requirement that the financial affairs of persons who are paid by the public and who occupy positions of high public trust be disclosed.

It is this relation of public employer and public employee that is here being regulated, and the requirements of disclosure of economic assets and interests is neither the only, nor the most important, way in which the legal rights of those who accept public employment are

set apart from the legal rights of others. Since the decision of the Supreme Court of the United States in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, the right of a public official or employee to recover damages for false and defamatory slander and libel charges which may destroy his good name has been sharply curtailed. (See *St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323; *Ocala Star-Banner Co. v. Damron* (1971), 401 U.S. 295, 28 L. Ed. 2d 57, 91 S. Ct. 628; Restatement (Second) of Torts (Tent. Draft No. 20) sec. 581A.) In *United Public Workers of America v. Mitchell* (1947), 330 U.S. 75, 91 L. Ed. 754, 67 S. Ct. 556, the Supreme Court stated: "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service." (330 U.S. 75, 101, 91 L. Ed. 754, 773.) More recently, in *United States Civil Service Com. v. National Association of Letter Carriers* (1973), 413 U.S. 548, 556, 37 L. Ed. 2d 796, 804, 93 S. Ct. 2880, 2886, the Supreme Court "unhesitatingly reaffirm[ed]" the *Mitchell* case in the course of its opinion sustaining the Hatch Act prohibition of political activity on the part of Federal employees. In the *Letter Carriers* case the court made the following comments:

"But, as the Court held in *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968), the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the

efficiency of the public services it performs through its employees.' Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." 413 U.S. 548, 564-565, 37 L. Ed. 2d 796, 808-809, 93 S. Ct. 2880, 2890; *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 37 L. Ed. 2d 830, 93 S. Ct. 2908.

We conclude, as did the Supreme Court of Washington in *Fritz v. Gorton* (1974), 83 Wash. 2d 275, 517 P.2d 911, *appeal dismissed for want of substantial Federal question* (1974), 417 U.S. 902, 41 L. Ed. 2d 208, 94 S. Ct. 2596, that financial disclosures required of State employees do not deprive them of their right of privacy guaranteed by the Constitution of the United States. And we concur in the following observations of the trial judge in the case before us:

"As noted, in the balancing of the individual employee's fundamental right to privacy and the state's compelling need for efficient, ethical government, the state's interest predominates. To promote its interest, the state is requiring complete financial disclosure. Such a means is substantially related to the end and is not overbroad. While full financial disclosure is burdensome, anything less would be ineffective in accomplishing the goal. The disclosure of only the sources of significant business interests and substantial amounts of income, as under the Ethics Act [Ill. Rev. Stat. 1973, ch. 127, par. 601 *et seq.*], is useful as far as it goes, but the information exempted is such that much corruption may go undetected. It is misleading, and ultimately un-

dermining of public confidence, to institute a disclosure program having exemptions as broad as the coverage. The inclusion of dollar amounts is justified because it allows for detection of many more types of unethical conduct."

The trial court found some of the disclosure provisions unsatisfactory, however, and we now turn to a consideration of those specific determinations. The first concerns the required disclosure of the financial interests of a spouse and members of the immediate family of a State employee living with him. The trial court held that the State may not require disclosure from such a person of financial interests "which are unrelated to the State employee." The difficulty with this position is the same as that which was pointed out in *Stein v. Howlett* (1972), 52 Ill.2d 570, 578: "It would be an anomaly to enact a statute, designed to eliminate conflicts of interest between public trust and private gain, in such manner that the person affected is permitted to decide when a financial interest relates to his public employment."

The trial court also took the position that the State must "construe the requirement for disclosure with respect to the spouse and members of the immediate family of the employee living with him to mean financial interests constructively controlled by the employee and/or property, the title to which is held for the employee." In *Stein v. Howlett* a similar reference in the Governmental Ethics Act to "constructive control" was challenged on the ground of vagueness, but the court found the phrase "sufficiently explicit to inform those who are subject to it of the conduct on their part to which it applies." (52 Ill.2d 570, 579-580.) That determination, however, was not a holding that the State could go no further. Both Rule 68 of the rules of this court, which requires judges to file declarations of economic interest, and the administrative order which implements that rule, require disclosure of

economic interests of the judge "and members of his immediate family (spouse and minor children residing with him)." (50 Ill.2d R. 68; *cf.* Report of the Committee on Court Administration, Annual Report of the Director of the Administrative Office of the United States Courts (1970), at 7-8.) Neither the rule of this court nor the implementing order refers to "constructive control," but we are not persuaded that the absence of that phrase invalidates them. Because of the danger of conflicts of interest of an indirect character, as well as the obvious possibility of subverting the loyalty of an employee through gifts to his spouse, we hold that the executive order and the rules of the Board need not be qualified as the trial court required.

The trial court also held that question 49 of the Financial Disclosure Statement was overly broad and that employees could not be required to answer it. The reason for this conclusion is that the question was thought by the trial court to go beyond economic associations. We do not agree with this interpretation of the question. The instructions to employees concerning this question state:

> "49. Enter here the names of all organizations other than the State in which you have a substantial interest. Indicate your position in the organization and your payment, if any, from the organization. Indicate approximately the amount of income, if any, that the organization receives from the State."

Question 49 and the related questions are as follows:

**49.** List each partnership, trust, political organization, local governmental unit, professional service corporation, or other (including non-profit) association of which you personally have been an officer, employee, director, trustee or partner since April 1, 1972.

| Association | Your Position | Your Payment | Approximate income Association Receives from State |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Is there a continuation sheet? YES____ NO____

50. Have you or any association listed in 49 above
represented anyone before State agencies since
April 1, 1972?                                              YES____NO_____
If "yes" list each agency and the type of matter
involved. Itemize:

            Agency                          Type of matter

_____      _____

_____      _____

_____      _____

_____      _____

         Is there a continuation sheet?  YES___NO____

51. If any person or entity in question 49 receives
over $500 from the State, check "yes" and explain on
a separate sheet of paper for each person or entity
(a) the nature of the income transaction (e.g.
"sale of concrete to the State"), and (b) the
relationship, if any, of your agency to this
transaction.                                               YES____NO_____

The tone of questions 49, 50 and 51 strongly suggests a limitation to economic interests. To the extent that question 49 and the related questions go beyond economic interests, they are, in our opinion, beyond the authority of the Board under Executive Order No. 4, the relevant portion of which is as follows:

"A statement of close economic associations, indicating the person's position with each business or professional entity with which the person is associated as an officer, employee, director or partner or in which he has a substantial interest and identifying those entities which derive substantial income from the State or from professional engagements concerning the State."

We hold therefore that these questions must be construed as referring only to economic associations. As so limited they are consistent with the executive order and violate no constitutional rights.

The trial judge stated in his opinion that the requirements that complete Federal and State income tax returns be filed for confidential use is vulnerable to attack for overbreadth, saying:

"A number of individuals itemize deductions, listing such items as medical expenses and charitable contributions. Compelling employees to pro-

vide such information for purposes of ethical enforcement cannot be justified by state need. It is a clear invasion of privacy."

And the judgment order of the trial court included the following paragraph:

"9. Defendants may not require the filing of that part of the employee's income tax returns which show itemized deductions where this would result in the disclosure of wholly private associations which are wholly unrelated to their employment."

Executive Order No. 4 requires the employees to whom it applies to file with the Board (1) a sworn statement of economic interest, and (2) a copy of his most recent Federal and State income tax returns. The order also provides that the statement of economic interest of each person shall be open to reasonable public inspection, and that the Board shall provide by rule for the time, place and manner of inspection.

With respect to public inspection and disclosure the Board has drawn a clear distinction between statements of economic interest and income tax returns. The former were to be open to public inspection under conditions prescribed in a proposed rule, the implementation of which was apparently impaired by the issuance of the temporary injunction in the trial court. Rule 7 of the rules of the Board, however, expressly states that income tax returns, including all schedules and attachments, shall not be open to public inspection at all. Paragraph 4 of Executive Order No. 4 does provide that portions of Federal or State income tax returns shall be made part of the Statement of Economic Interest, but only those portions which are "pertinent" to income transactions.

So far as income tax deductions are concerned, therefore, any claimed "invasion of privacy" amounts to no more than the required disclosure by an employee to his employer, the State of Illinois, of information which

the employee has already disclosed to the Federal government by filing his income tax return. We are unaware of any constitutional requirement that income tax returns be kept secret. Any Congressional provision currently limiting disclosure of those returns could, in our opinion, be repealed without impairing the validity of the tax. The treatment now given by Congress to this particular form of taxation is exceptional. In these circumstances we do not believe that the required filing of income tax returns represents any constitutionally significant impairment of the privacy of the individual employees affected by the executive order.

The problem as we see it is not one of constitutional right. The trial judge framed his conclusion in terms of "overbreadth" of the requirement. In this context an "overly broad" disclosure means a disclosure of more matters or more detail than the judge thinks necessary to accomplish the purpose of one of the other branches of government. Whether a particular disclosure is necessary to accomplish the purposes of the executive order is primarily a matter for the executive branch to determine. Nothing in this record justifies us in concluding that its determination is unreasonable.

To the extent that the judgment of the circuit court sustains the validity of the executive order and the action of the Board, it is affirmed, and to the extent that it holds them invalid, it is reversed.

*Affirmed in part and reversed in part.*

MR. JUSTICE RYAN, dissenting:

I dissent from the majority opinion because I believe that the Illinois Constitution of 1970 creates a right of privacy which is violated by this financial-disclosure scheme.

As originally presented to the constitutional convention by the Bill of Rights Committee, section 6 of article I was worded as follows:

"The right of the people to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, interceptions of their communications, by eavesdropping devices or other means, or invasions of their privacy shall not be violated." 6 Proceedings 29.

In its written explanation of this proposal, the Committee stated:

"Forty-five state constitutions have provisions substantially similar to the existing Section 6 of the Bill of Rights ***. The new section supplements the existing language in *two* important respects. It adds a right against 'interceptions of their communications by eavesdropping devices or other means' and *it adds a right against 'invasions of their privacy'*. Both additions treat subjects in the forefront of present public concern, although neither is found in many state constitutions. ***

The changes incorporated in this new provision are as follows:

(1) The words 'other possessions' are substituted for the word 'effects' in the first clause. ***

(2) The words 'interceptions of their communications by eavesdropping devices or other means' have been inserted in the first clause. This addition is intended to create a right in respect to interception of communications that is akin to the prohibition against 'unreasonable searches and seizures'. ***

(3) The words 'invasions of their privacy' were inserted in the first clause to protect people against invasions of their privacy. It is doubtless inevitable that any person who chooses to enjoy the benefits of living in an organized society cannot also claim the privacy he would enjoy if he were to live away from the institutions of government and the multitudes of his fellow men. It is probably also inevitable that infringements on individual privacy will increase as our society becomes more complex, as government institutions are expected to assume larger responsibilities, and as technological developments offer additional or more effective means by which privacy can be invaded. In the face of these conditions the Committee concluded it was essential to the dignity and well being of the individual *that every person be guaranteed a zone of privacy in which his thoughts and highly personal behavior were not subject to*

*disclosure or review.* The new provision creates a direct right to freedom from such invasions of privacy *by government or public officials.*" (Emphasis added.) 6 Proceedings 29 through 32.

In presenting this section to the convention on behalf of the Bill of Rights Committee Delegate Dvorak explained that the section contained three basic concepts; first, searches and seizures; second, eavesdropping and wiretapping; and third, the right to privacy. In discussing the right to privacy he stated:

"The cases that I have noted that deal with eavesdropping have pretty much intruded into the area of privacy because now the area of privacy that once was thought to be a complete area in and of itself mostly is the reason given for why eavesdropping, wire-tapping, and bugging activities are unconstitutional. *But there is the area of privacy still existing in very particular instances.* For instance, we have now the concept of a general information bank whereby the state government or the federal government can take certain pertinent information about each and every one of us based on, for instance, our social security number—know our weight, height, family ages, various things about us—and this is not acceptable to—was not acceptable—or the theory or the thought of such a thing—was not acceptable to the majority of our committee in approving section 6." (Emphasis added.) 3 Proceedings 1525.

I find it clear from this discussion and from the language of section 6 itself that as originally proposed that section created a right to privacy independent of the prohibitions against unreasonable searches and seizures and wiretapping. After lengthy debate section 6 was approved and forwarded to the Committee on Style, Drafting and Submission. That Committee rearranged the wording of section 6 and placed the provision concerning invasions of privacy before instead of after the provision concerning interceptions of communications by eavesdropping devices or other means. The majority of this court believes that the effect of this revision was to significantly limit the scope of the right to privacy to the area of eavesdropping.

However, this interpretation of the stylistic alteration in the language of section 6 is inconsistent with the Committee's own interpretation of their work. In explaining the revisions of section 6 to the convention the Committee on Style, Drafting and Submission stated that "no substantive change is made." 6 Proceedings 217.

Moreover, in the "Address to the People" adopted by the convention on September 2, 1970, and included in the information concerning the constitution distributed to the electorate before the referendum on the adoption of the 1970 Constitution, we find the following statement concerning the Bill of Rights article:

"*** Individual rights protected by the present Constitution are retained. There are additional new protections. *** Unreasonable invasions of privacy are prohibited; ***." 7 Proceedings 2673.

And in the explanation to the voters of the revised version of section 6 the convention stated:

"This is an amended version of Article II, Section 6 of the 1870 Constitution expanded to include guarantees of freedom from unreasonable eavesdropping *and invasions of privacy.*" (Emphasis added.) 7 Proceedings 2683.

This history of the origins of section 6 leads to what I consider the inescapable conclusion that our constitution creates a right to privacy independent of the constitutional protection against searches and seizures and wiretapping.

This conclusion is buttressed by our decision in *Stein v. Howlett,* 52 Ill.2d 570. In *Stein* we were confronted with a number of challenges to the Illinois Governmental Ethics Act (Ill. Rev. Stat., 1971 Supp., ch. 127, par. 604A—101 *et seq.*), including a contention that the Act was an unconstitutional invasion of privacy. The majority opinion in this case makes scant reference to the language of *Stein.* Immediately preceding the sentence which the majority quotes from *Stein* we find this language:

"The confirmation of the right of privacy as a constitutional right is found in section 6 of

article I of the 1970 constitution which expressly states, for the first time in our State charters, that people 'have the right to be secure in their persons, houses, papers and other possessions against *** *invasions of privacy* ***." (Italics in reported opinion.) 52 Ill.2d at 574.

Then following a detailed analysis of the statute under consideration we stated in *Stein:*

"The purpose of the legislation supports the necessity for broad statutory coverage in this area. We believe that the statute as cast reflects the compelling governmental interest which is paramount to the rights of the individual, and that the statute is not overbroad as *an unconstitutional invasion of privacy.*" (Emphasis added.) 52 Ill.2d at 578.

Our detailed analysis would have been unnecessary if no right of privacy in one's financial affairs had been created by section 6 of article I of the 1970 Constitution. Therefore, I believe that in *Stein* not only did we recognize but also we impliedly held that such a right was created by section 6. The majority opinion has not effectively dealt with *Stein.* We must either hold that our constitution creates a right of privacy embracing one's financial affairs or we must overrule *Stein* to the extent that it so holds.

The majority believes that any doubt existing as to the ultimate meaning of section 6 has been dispelled by the rejection by the constitutional convention of an amendment which would have stricken section 2 of article XIII which authorizes economic disclosures. In support of the amendment one of its co-sponsors stated that he opposed section 2 of article XIII because he believed that it is an invasion of the right of privacy and referred to the discussion by the California Supreme Court in *City of Carmel-by-the-Sea v. Young,* 2 Cal. 3d 259, 466 P.2d 225, 85 Cal. Rptr. 1. In referring to that decision the delegate stated that it isn't all disclosure that the court held to be within the

unconstitutional category. In concluding he stated: "I suggest that this is a matter for legislation and does not belong within the constitution, and that I therefore urge support of this amendment." (3 Proceedings 1800.) It should be remembered that this amendment was offered at the time that the original section 2 provided "Each candidate for or holder of a state office created by this Constitution shall declare his and his immediate family's income, the sources thereof, their assets and liabilities, and any significant non-economic interest." 6 Proceedings 605.

Before the amendment to delete section 2 was debated that section had been amended and the words "declare his and his immediate family's income, the source thereof, assets and liabilities, and any significant non-economic interest" had been deleted and in lieu thereof the words "file a statement of interest, which shall include a list of significant economic and noneconomic interests, as prescribed by law" had been inserted. (3 Proceedings 1772.) Thus when the proposal to delete section 2 was debated the delegates would have had no way of knowing the nature of the disclosures which would subsequently be required by statute and whether or not they would infringe upon the right of privacy. As above noted the delegate that spoke in favor of the deletion of all of section 2 acknowledged that it isn't all disclosures that fall within the category of being unconstitutional as an invasion of the right of privacy. It is further suggested that the delegates suggestion that it is a matter for legislation and does not belong within the constitution may well have been thought by the other delegates to have already been accomplished by the previously adopted amendment to section 2. Furthermore the other co-sponsor of this amendment in his closing summation urging its adoption made no reference at all to the right of privacy. After having read and reread the debates relating to section 2 of article XIII I can find no basis for concluding that the defeat of the amendment to delete all of section 2 was

based upon the rejection of the idea that section 2 invaded the right of privacy. The mere mention of the right of privacy by one delegate speaking on behalf of the amendment, which comment was not entirely relevant, does not indicate to me that the right of privacy question was the reason for the rejection of the amendment.

I also believe, contrary to the majority, that personal financial affairs are within the realm of the right to privacy created by the Federal Constitution. In *Roe v. Wade,* 410 U.S. 113, 152, 35 L. Ed. 2d 147, 176, 93 S. Ct. 705, the United States Supreme Court observed that the roots of the right to privacy have been found in the First Amendment, the Fourth and Fifth Amendments, the Ninth Amendment, and in the penumbras of the Bill of Rights. The court concluded in *Roe* that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty" are included in this guarantee of personal privacy. Although the United States Supreme Court has not yet decided whether a person's financial affairs fall within the protected right of privacy under the Federal Constitution, it was recently stated by Mr. Justice Powell of that court: "Financial transactions can reveal much about a person's activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy." *California Bankers Association v. Shultz,* 416 U.S. 21, 78-79, 39 L. Ed. 2d 812, 850, 94 S. Ct. 1494, 1526 (Powell, J., concurring, joined in by Blackmun, J.).

Although I believe that section 6 of article I creates a right to privacy embracing one's financial affairs, I also realize that this right is not absolute. Regulations limiting this right may be justified by a compelling State interest but such limitations must be narrowly drawn to express only the legitimate State interests at stake and the compelling interest may not be achieved by unnecessarily broad measures. *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705; *Stein v. Howlett,* 52 Ill.2d 570; *Bates*

*v. City of Little Rock,* 361 U.S. 516, 4 L. Ed. 2d 480, 80 S. Ct. 412.

The obvious purpose of Executive Order No. 4 is to instill in the public trust and confidence in the State government and to disclose or prevent possible conflicts of interest which may involve State employees. As we stated in *Stein* such a purpose reflects a compelling State interest and justifies a limited intrusion into the financial privacy of the employees affected. However, even though the State has a compelling interest in this area, and has more latitude in regulating the affairs of its employees than those of private citizens (*Broadrick v. Oklahoma,* 413 U.S. 601, 37 L. Ed. 2d 830, 93 S. Ct. 2908; *United States Civil Service Com. v. National Ass'n of Letter Carriers,* 413 U.S. 548, 37 L. Ed. 2d 796, 93 S. Ct. 2880), a balance must still be struck between the legitimate objectives of the State and the privacy expectations of the employee. *Pickering v. Board of Education,* 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731.

As a basic premise I agree with the State that a person's private financial affairs may exert an influence on the performance of his official functions. This would most obviously be true if an employee had a financial interest in a business or organization having dealings with the government agency employing him. Inquiry directed to disclosing such potential conflict is certainly proper. Furthermore, because financial ties to organizations or businesses apparently unrelated to a person's official position might be a potential source of conflict, inquiry into such affairs also seems proper. As we noted in *Stein,* "It would be an anomaly to enact a statute, designed to eliminate conflicts of interest between public trust and private gain, in such manner that the person affected is permitted to decide when a financial interest relates to his public employment. The purpose of the legislation supports the necessity for broad statutory coverage in this area." (52 Ill.2d at 578.) This is particularly true of a

disclosure scheme which is designed not only to disclose actual conflicts, but also to instill public confidence in government. Achieving this goal would be difficult if substantial financial ties of public employees were not disclosed. Executive Order No. 4 and the Financial Disclosure Statement issued to implement the Order, however, are not limited to an inquiry into financial ties which might conflict with an employee's official duties. The Order demands disclosure of every aspect of a person's financial life. It requires that the Statement include "a current net worth statement, disclosing *all* assets and liabilities of the person." (Emphasis added.) The Order also requires that the Statement contain a statement of income (including capital gains) received during the preceding calendar year, disclosing: "(1) *each source* of income, (2) the total amount received from the source, and (3) the nature of the income transactions involving the source." (Emphasis added.) Subject to rule of the Board, the Statement shall also disclose the interests of the spouse and immediate family living with the person making the statement.

It should be remembered, that this Financial Disclosure Statement, as provided by the Executive Order, shall be open to reasonable public inspection. The Order authorizes the Board to provide by rule for the time, place and manner of the inspection of these documents.

The Order and the Financial Disclosure Statement are designed to reveal an employee's net worth. Since these statements are open to public inspection the State employee must bare to the world the minute details of his financial affairs for whatever use the curious may wish to make of this information. I do not believe that this expansive intrusion into the privacy of the employees is necessary to achieve the State's legitimate objectives. It is not necessary that the public know the net worth of an employee, since there is no reason to believe that a wealthy public servant will be less truthworthy than one of

more modest means or *vice versa*. It is therefore unnecessary that the value of personal assets not in the form of business interests be disclosed.

While the State has a legitimate interest in knowing the nature of an employee's financial holdings in corporations or business ventures which might possibly influence his conduct, I do not think it is necessary that the dollar value of those holdings be revealed. The disclosure of the financial relationship by itself will illuminate areas of possible conflicts of interest. For purposes of general disclosure the State's interest in discovering the monetary extent of these interests is outweighed by the employee's interest in privacy. Thus, I am of the opinion that the requirement of the Order that an employee list the actual dollar value of outside income or business interests constitutes an unreasonable intrusion upon the privacy of the individual and is invalid.

Furthermore, for the same reason I find offensive the requirement of Executive Order No. 4 that a copy of the employees' State and Federal income tax returns be filed with the statement. Although it is true, as the majority observes, that under current Rule 7 of the Board of Ethics these returns are not open to public inspection, nothing in the Executive Order prevents an alteration of the rules by the Board to permit public inspection or limited public inspection of these income tax returns.

In concluding that this disclosure scheme does not infringe upon the right of privacy of State employees, the majority cites as support *Fritz v. Gorton* (1974), 83 Wash. 2d 275, 517 P.2d 911. I find that decision to be of little assistance to the majority opinion because the financial disclosure scheme which was upheld in that decision by the Supreme Court of Washington bears little resemblance to the scheme before us. The Washington disclosure scheme requires much more general disclosure than that required under this Order. Section 24 of the Washington law requires elected officials to disclose financial interests

and obligations only in general categories. Under that scheme it would not be necessary to disclose one's exact net worth. The Washington Supreme Court considered this aspect of the disclosure requirement in determining whether the right of privacy was invaded. The court observed:

> "The provisions of section 24 do not sweep so broadly as to be constitutionally impermissible. Section 24 does not cavalierly mandate a picayune itemization of personal affairs, but requires only the listing of financial data and relationships with amounts to be designated, not in specific amounts, but by general categories of varying monetary degree." (83 Wash. 2d at 299, 517 P.2d at 925.)

Because of these important differences in the disclosure requirements of the Washington law, the decision of the Washington Supreme Court sustaining that law is of no persuasive value here.

I must also disagree with the statement of the majority that, "whether a particular disclosure is necessary to accomplish the purposes of the Executive Order is primarily a matter for the executive branch to determine." While this statement is a natural conclusion from the majority position that there exists no right to privacy in one's financial affairs, believing as I do that such matters are embraced by a constitutional right to privacy, I must conclude that deciding the validity of disclosure provisions is primarily a function of this court.

For these reasons I believe that Executive Order No. 4 is an unconstitutional invasion of the right of privacy of the State employees who are subject to its disclosure requirements.

MR. JUSTICE GOLDENHERSH joins in this dissent.