**Kenneth A. PLANTE et al., Plaintiffs-Appellants,**

v.

**Larry GONZALEZ, etc., et al., Defendants-Appellees.**

**Jon C. THOMAS, Plaintiff-Appellant,**

v.

**Larry GONZALEZ, etc., et al., Defendants-Appellees.**

**No. 77-3109.**

United States Court of Appeals, Fifth Circuit.

June 30, 1978.

Rehearing and Rehearing En Banc Denied Aug. 31, 1978.

---

lain, Tallahassee, Fla., Nelson, Hesse, Cyril, Weber & Sparrow, Sarasota, Fla., for Plante, et al.

William E. Williams, Tallahassee, Fla., for Thomas.

Douglas C. Kearney, Asst. Atty. Gen., James D. Whisenand, Deputy Atty. Gen., Tallahassee, Fla., for defendants-appellees.

Parker D. Thomson, Miami, Fla., for amicus curiae League of Women Voters of Fla., Inc.

Before WISDOM, GODBOLD, and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

"[W]ith the decline of religion the law has moved to take over the preventive as well as the punishing function. A man must not only avoid the act that the crowd considers criminal; he must avoid the opportunity, or even the appearance of the opportunity to commit such an act. Without a conscience it is only logical to assume that he will succumb to temptation. Society, therefore, now tries to legislate an end to temptation. . . . The wrong is to be found not in the subjective intent of a fiduciary to betray his trust; such intent will be deduced from the mere existence of a factual situation that in the average man might create temptation." [1]

In 1976 the voters of Florida approved the "Sunshine Amendment" to the state constitution requiring that certain elected officials make public detailed information about their personal finances. Five state senators sued the officials charged with administering the financial disclosure provisions of the amendment.[2] They argued that this exercise of the public's "right to know" violated their constitutional right

Tobias Simon, Miami, Fla., Charles L. Carlton, Lakeland, Fla., Richard C. McFar-

1. Auchincloss, When Interests Conflict, N. Y. Times, May 22, 1978.

2. The senators are Kenneth A. Plante, Dempsey J. Barron, Philip D. Lewis, William Gorman, Jack D. Gordon, and Jon C. Thomas. The

defendants are the Executive Director of the Ethics Commission, the Florida Secretary of State, the Governor, and the Commission on Ethics.

"not to be known". The district court upheld the disclosure requirements. We affirm.

## I.

Florida entered the 1970's with a relatively weak statute forbidding public officials from acting in conflict of interest. 1967 Fla.Laws 469 (replacement codified at Fla. Stat.Ann. § 112.311, *et seq.* (West 1978 Supp.)). The statute covered officers and employees of state agencies, counties, cities, and other political subdivisions, as well as legislators and legislative employees. 1967 Fla.Laws 469, § 3. The Act set standards of conduct. Violations were grounds for removal from office or employment, as well as misdemeanors, 1967 Fla.Laws 469, § 7. No administrative body regulated official ethics, and the Act required no financial disclosure.

Political scandals rocked Florida in the seventies.[3] One result was a new law governing conflicts of interest. The 1974 statute made numerous changes in the previous law. The most important, for our purposes, was that for the first time, certain officials and employees were required to file statements of their financial interests. Fla.Stat. Ann. § 112.3145 (West Supp.1978). The statute also created an administrative body to oversee compliance, the Commission on Ethics. Fla.Stat.Ann. § 112.320 (West Supp.1978). Local officers, state officers, and "specified employees", all terms carefully defined in the Act, were covered by the disclosure requirement, as were candidates for state or local elective office. The Act required disclosure of five categories of personal financial information:[4] (1) all sources of income exceeding five percent of gross income for the period covered; (2) all sources of income to a business entity exceeding ten percent of its gross income, *if* the official received an amount from the business entity which was both more than ten percent of the official's gross income and more than $1500; (3) the location and description of all Florida real estate excluding residences and vacation homes, in which the official had more than a five percent interest, and a general description of any intangible personal property worth more than ten percent of the official's total assets; (4) the source of any gifts in excess of $100, except gifts from family members or gifts received through bequest or devise; and (5) every debt greater than the official's net worth. Fla.Stat.Ann. § 112.3145 (West Supp.1978). In no case was the official required to disclose a specific dollar amount. The disclosures were to be listed in descending order of magnitude. The statements were to be filed either with the Secretary of State, by state officials and specified employees, or with a local judge, by local officials. Such statements were "public records". Fla.Stat.Ann. § 112.3146. The full text of the relevant subsection is set out in Appendix A.

This legislation, even as amended in 1975, 1975 Fla.Laws 196, did not satisfy the public's appetite for stricter controls on conflicts of interest. The Florida Constitution may be amended by popular initiative. Fla. Const. art. XI, § 3. A successful drive for signatures to a petition put the "Sunshine Amendment" on the Florida ballot in 1976. The initiative passed: 1,765,626 in favor, 461,940 opposed.

The amendment, now Article II, § 8 of the Florida Constitution, covers several as-

---

**3.** Florida's Controller, Treasurer, and Superintendent of Education were indicted for selling their influence. A legislative committee recommended that one state supreme court justice be impeached for similar activities. A second justice resigned under fire. A third supreme court justice was reprimanded by the state body supervising judicial conduct. N. Y. Times, April 27, 1975, at 35, col. 1. In 1976 U.S. Representative Robert L. F. Sikes was reprimanded by the House of Representatives because as Chairman of the House Appropriations subcommit-

tee on military construction he had helped pass legislation and secured government decisions from which he benefitted financially. United States Senator Edward Gurney was acquitted of federal charges stemming from alleged influence peddling. N. Y. Times, July 12, 1974, at 10, col. 1; October 28, 1976, at 19, col. 1.

**4.** The law also requires quarterly disclosure of the names of any clients represented by an official or employee for a fee or commission before governmental agencies.

pects of conflicts of interest. *See* Appendix B. The part particularly germane to this appeal is subsection (h)(1):

"Full and public disclosure of financial interests shall mean filing with the secretary of state by July 1 of each year a sworn statement showing net worth and identifying each asset and liability in excess of $1,000 and its value together with one of the following:

a. A copy of the person's most recent federal income tax return; or

b. A sworn statement which identifies each separate source and amount of income which exceeds $1,000. The forms for such source disclosure and the rules under which they are to be filed shall be prescribed by the independent commission established in subsection (f) [the statutorily created Commission on Ethics], and such rules shall include disclosure of secondary sources of income."

Fla.Const. art. II, § 8(h)(1). The constitutional amendment applies to elected constitutional officials, candidates for such offices, and any other "public officers, candidates, and employees" as determined by law. Fla.Const. art. II, § 8(a).[5]

The Florida Commission on Ethics set August 1, 1977, as the deadline for the first filing under the amendment. On July 10, 1977, this suit was filed. The senators sought a declaration that the amendment violated rights guaranteed them by the ninth and fourteenth amendments to the United States Constitution. The senators alleged that they had complied with the statutory disclosure requirements, but would resign rather than comply with the demands of the Sunshine Amendment.

On July 29, 1977, the district court denied the senators' application for a preliminary injunction for failure to show a substantial chance of success on the merits. The defendants moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. After a hearing on September 9, 1977, the court granted the motion.

The court held that the senators' contentions foundered, because the rights they asserted were not "fundamental" constitutional rights: The right to privacy extends only to intimate decisions, usually connected with the family; any right to financial privacy does not rise to constitutional significance. The court found that the Amendment is constitutional when subjected to a balancing test, possibly required by *Nixon v. Administrator of General Services,* 1977, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867. Finding no legal protection for the senators, the court dismissed their complaint. Their appeal, expedited by this Court, followed.[6]

The senators raise two substantial constitutional questions.[7] First, they argue that the public disclosure of their personal financial affairs violates their federally protected right to privacy, derived from the shadows of the Bill of Rights and made applicable to Florida through the fourteenth amendment. Second, they argue that the disclosure scheme unconstitutionally burdens candidates for office, thus depriving voters of their right to vote for candidates of their choice. While many state courts have ruled on the constitutionality of similar plans, this appears to be a case of first impression

---

**5.** A law extending the disclosure provisions of the Amendment to municipal officers, appointed officials, and other public officers and employees was passed by the legislature in 1977 but vetoed by the governor. Appellants' brief at 3, n. 3. The "persons holding statewide elective office" referred to in § 8(h)(2), not covered by § 8(a), appear to include only the members of the Florida Public Service Commission. Brief of Common Cause, amicus, at 2.

**6.** Three amicus briefs were filed. The American Civil Liberties Union filed a brief on behalf

of the senators; the Florida League of Women Voters and Common Cause filed briefs on behalf of the State.

**7.** The senators also argue that the statute has no rational relationship to any legitimate state ends. Appellants' brief, 10–14. Our analysis of the other constitutional challenges uses a standard of review more strict than this argument utilizes. Our conclusion on those contentions, therefore, controls our conclusion on this one.

for the lower federal bench.[8] We will deal with the second, less difficult, issue first.

**8.** Many state courts have ruled on similar plans.

ALABAMA. *Comer v. City of Mobile*, Ala. 1976, 337 So.2d 742, with no privacy argument, upheld except in breadth of application.

ALASKA. *Falcon v. Alaska Public Offices Comm'n*, Alaska 1977, 570 P.2d 469, enjoined disclosure of doctor-official's patients until narrowing regulations are implemented because of the patient's right to privacy.

CALIFORNIA. *City of Carmel-by-the-Sea v. Young*, 1970, 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225, struck down an Act which required disclosure by all officials of all interests on federal privacy grounds. *County of Nevada v. MacMillen*, 1974, 11 Cal.3d 662, 114 Cal.Rptr. 345, 522 P.2d 1345, upheld a narrower replacement statute.

FLORIDA. *Goldtrap v. Askew*, Fla.1976, 334 So.2d 20, upheld Florida's statutory disclosure requirement.

ILLINOIS. *Buettell v. Walker*, 1974, 59 Ill.2d 146, 319 N.E.2d 502, upheld an executive order requiring disclosure of political contributions by some parties against a privacy claim, but found that it exceeded the governor's authority. *Illinois State Employee's Ass'n v. Walker*, 1974, 57 Ill.2d 512, 315 N.E.2d 9, *cert. denied sub nom. Troopers Lodge No. 41 v. Walker*, 1974, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 656 (Powell and Blackmun, JJ., would have granted certiorari), upheld against state and federal privacy arguments an executive order requiring certain employees to make disclosures, including dollar amounts. *Stein v. Howlett*, 1972, 52 Ill.2d 570, 289 N.E.2d 409, *app. dism'd*, 1973, 412 U.S. 925, 93 S.Ct. 2750, 37 L.Ed.2d 152, upheld a statute requiring state officeholders to make financial disclosure.

MARYLAND. *Montgomery County v. Walsh*, 1975, 274 Md. 502, 336 A.2d 97, *app. dism'd*, 1976, 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306, upheld disclosure against a federal privacy argument, finding no fundamental right of financial privacy and holding that even if such a right existed, the state's compelling interest justified the statute and county ordinance involved.

MICHIGAN. Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2–10), 1976, 396 Mich. 465, 242 N.W.2d 3, held that similar treatment of high officials and local employees was invalid and that the state interest did not justify the disclosures required of the employees.

MINNESOTA. *Klaus v. Minnesota State Ethics Commission*, 1976, 309 Minn. 430, 244 N.W.2d 672, upheld a disclosure law which did not require dollar amounts against privacy attack, with dicta concerning the privileged status of net worth and amount of income.

MISSOURI. *Chamberlin v. Missouri Elections Comm'n*, Mo.1976, 540 S.W.2d 876, sustained a disclosure law requiring attorneys to identify the sources of their income over attorney-client privilege and overbreadth objections.

NEVADA. *Dunphy v. Sheehan*, Nev.1976, 549 P.2d 332, declared a disclosure law unconstitutional on vagueness grounds, with dicta opposing the use of dollar values.

NEW JERSEY. *Lehrhaupt v. Flynn*, Chan.Div. 1974, 129 N.J.Super. 327, 323 A.2d 537, *aff'd*, App.Div.1976, 140 N.J.Super. 250, 356 A.2d 35, upheld a town disclosure ordinance against a privacy attack, finding that invasion of a fundamental right, if any, was justified by the town's interests. *Kenny v. Byrne*, App.Div.1976, 144 N.J.Super. 243, 365 A.2d 211, upheld an executive order requiring disclosure by certain appointed officials against a privacy challenge while applying the rational relationship test.

NEW YORK. *Hunter v. City of New York*, N.Y.Sup.Ct.1976, 88 Misc.2d 562, 391 N.Y.S.2d 289, *aff'd*, 1977, 58 A.D.2d 136, 396 N.Y.S. 186, upheld a New York City law requiring disclosure after interpreting it to allow public disclosure only after employees had an opportunity for a hearing on any specific privacy claims. *Dwyer v. Kahn*, N.Y.Sup.Ct.1976, 88 Misc.2d 73, 387 N.Y.S.2d 535, upheld Public Service Commission disclosure and divestiture rules against privacy challenge. *Evans v. Carey*, 1976, 53 A.D.2d 109, 385 N.Y.S.2d 965, *aff'd*, 1976, 40 N.Y.2d 1008, 391 N.Y.S.2d 393, 359 N.E.2d 983, upheld an executive order requiring disclosure by employees and officials which included a provision for deleting extremely personal matters.

WASHINGTON. *Fritz v. Gorton*, 1974, 83 Wash.2d 275, 517 P.2d 911, *app. dism'd*, 1974, 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208, upheld against privacy challenges a detailed disclosure law which required disclosure of value ranges rather than dollar figures.

WISCONSIN. *In re Kading*, 1975, 70 Wis.2d 508, 235 N.W.2d 409, upheld a Court rule requiring financial disclosure without dollar values by judges against a privacy challenge.

We have discovered only one federal case dealing with a similar issue. In *O'Brien v. DiGrazia*, 1 Cir. 1976, 544 F.2d 543, *cert. denied sub nom., O'Brien v. Jordan*, 1977, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223, the First Circuit upheld an order by the Boston police commissioner which required certain police officers to disclose their families' income sources, assets, rough expenditures, and copies of their state and federal tax returns. This information was to be held in confidence by the Commissioner's office. The patrolmen had been linked with organized crime. The Court was not convinced that a right to financial privacy existed. "Privacy in the sense of freedom to withhold personal financial information from the government or the public has received little constitutional protection." 544 F.2d at 545–46. The Court then assumed that some right exists, balanced the interests involved, and affirmed

Before we turn to the merits of the case, one question demands attention. The Supreme Court has acted on four cases from state supreme courts involving similar plans. *Montgomery Co. v. Walsh*, 1975, 274 Md. 502, 336 A.2d 97, *app. dism'd*, 1976, 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306; *Illinois State Employees Ass'n v. Walker*, 1974, 57 Ill.2d 512, 315 N.E.2d 9, *cert. denied, sub nom. Troopers Lodge No. 41 v. Walker*, 1974, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 656; *Fritz v. Gorton*, 1974, 83 Wash.2d 275, 517 P.2d 911, *app. dism'd*, 1974, 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208; *Stein v. Howlett*, 1972, 52 Ill.2d 570, 289 N.E.2d 409, *app. dism'd*, 1973, 412 U.S. 925, 93 S.Ct. 2750, 37 L.Ed.2d 152. Denial of a petition for certiorari, of course, carries no precedential weight. *See Maryland v. Baltimore Radio Show*, 1950, 338 U.S. 912, 917–19, 70 S.Ct. 252, 254–55, 94 L.Ed. 562, 565–66 (Justice Frankfurter, separate opinion). The dismissal of an appeal or a summary affirmance, on the other hand, is a disposition on the merits. The Supreme Court advised lower courts in *Hicks v. Miranda*, 1975, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223, to follow

> "the Second Circuit's advice . . . in *Port Authority Bondholders Protective Committee v. Port of New York Authority*, 387 F.2d 259, 263 n.3 (1967), that 'unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise' . . . .."

422 U.S. at 344, 95 S.Ct. at 2289. In *Hicks* the Court ruled that a three judge district court erred by not considering itself bound on the constitutionality of California's obscenity law by an earlier law by an earlier

Supreme Court's dismissal of a challenge to that Act.[9]

The significance of *Hicks* was clarified by the Court in *Mandel v. Bradley*, 1977, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199. In *Mandel* the lower court struck down Maryland's law regulating access to the ballot. The lower court relied on the Supreme Court's dismissal of *Tucker v. Salera*, 1976, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727, *aff'g*, E.D.Pa.1975, 399 F.Supp. 1258. This reliance, the Court held, was misplaced:

> "Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions. After *Salera*, for example, other courts were not free to conclude that the Pennsylvania provision invalidated was nevertheless constitutional.

.     .     .     .     .

> The precedential significance of the summary action in *Salera*, however, is to be assessed in the light of all of the facts in that case; and it is immediately apparent that those facts are very different from the facts of this case."

432 U.S. at 176, 97 S.Ct. at 2240, 53 L.Ed.2d at 205. The different facts in *Mandel* were the differences between the Pennsylvania and Maryland statutes. Here, the Supreme Court has upheld disclosure provisions in Washington, Illinois, and Maryland statutes. Each statute differs from the others; each differs from the Sunshine Amendment. The dismissals by the Supreme

---

the lower court's Rule 12(b)(6) dismissal of the complaint.

9. The Court did describe the method the lower courts should follow in determining the effect to be given summary dismissals.

> "Of course, Miller II [*Miller v. California*, 418 U.S. 915, 94 S.Ct. 3206, 41 L.Ed.2d 1158] would have been decisive here only if the issues in Miller II and the present case were

sufficiently the same that Miller II was a controlling precedent. Thus, had the District Court considered itself bound by summary dismissals of appeals by this Court, its initial task would have been to ascertain what issues had been properly presented in Miller II and declared by this Court to be without substance."

422 U.S. at 345 n. 14, 95 S.Ct. at 2290.

Court caution us against finding the Amendment unconstitutional. See *Mandel v. Bradley*, 432 U.S. 173, 179–80, 97 S.Ct. 2238, 2242, 53 L.Ed.2d 199, 206–07 (Justice Brennan, concurring). They did not relieve us of our duty "to undertake an independent examination of the merits". 432 U.S. at 177, 97 S.Ct. at 2241, 53 L.Ed.2d at 205. We now turn to that task.

## II.

The American Civil Liberties Union, as amicus, argues that the amendment unconstitutionally burdens the right to run for office. If the amendment is upheld, the appellants say that they will resign. Other candidates will be deterred from running. The A.C.L.U. argues that this restriction on political activity equals or exceeds that caused by the filing fees invalidated by the Supreme Court in *Lubin v. Panish*, 1974, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 and *Bullock v. Carter*, 1972, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92.

■ The right to run for office is not a "fundamental" right. The Court has at times protected candidacy as a way to protect the right to vote itself.

> [T]he Court has not heretofore attached . . . fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review . . . In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

*Bullock v. Carter*, 405 U.S. at 142–43, 92 S.Ct. at 856. The Supreme Court has examined such restrictions in at least four

contexts: loyalty oaths, *Communist Party v. Whitcomb*, 1974, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635; residency and durational requirements, *McCarthy v. Philadelphia Civil Service Comm'n*, 1976, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (per curiam); *Sununu v. Stark*, 1975, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435, aff'd mem. D.N.H.1974 (three judge court), 383 F.Supp. 1287; petition requirements for appearing on the ballot, *Storer v. Brown*, 1974, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714; *American Party v. White*, 1974, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744; and filing fees, *Lubin v. Panish*, 1974, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702; *Bullock v. Carter*, 1972, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92. The loyalty oaths and filing fees were invalidated, the residency and durational requirements were upheld, and dispositions of the petition requirements have varied.[10]

■ Disclosure requirements may deter some people from seeking office. As the Supreme Court has made clear, however, mere deterrence is not sufficient for a successful constitutional attack. *Bullock v. Carter*, 1972, 405 U.S. at 142–43, 92 S.Ct. 849. Otherwise, official salary levels or the location of the capital city might furnish the basis for a constitutional attack. The key to this issue is who is excluded. These requirements are not unconstitutional unless "they are so restrictive that they deny a cognizable group a meaningful right to representation". Tribe, American Constitutional Law, § 13–19 (1978). See also Developments in the Law—Elections, 88 Harv.L. Rev. 1111, 1218, 1176–77 (1975). The loyalty oath cases clearly denied representation to groups with beliefs which could not be squared with the oath involved. The filing fee cases denied access to the ballot to poorly financed candidates. In *Bullock* the Court concluded that the fees had a "real

---

**10.** Age requirements for officeholding, though widespread, have not been tested in the Supreme Court. Lower courts and commentators have agreed that they need bear only a rational relationship to state interests. *See, e.g., Manson v. Edwards*, 6 Cir. 1973, 482 F.2d 1076;

Developments in the Law—Elections, 88 Harv. L.Rev. 1111, 1223–25. *But see* Note, Age and Durational Residency Requirements as Qualifications for Candidacy: A Violation of Equal Protection? 1973 U.Ill.L.F. 161, 177–78.

and appreciable impact on the exercise of the franchise . . . related to the resources of the voters supporting a particular candidate . . ..” 405 U.S. at 144, 92 S.Ct. at 856. The connection with the group of poor voters prompted the scrutiny the law received. The petition requirements also struck at a group of voters, those outside the two major parties.

In contrast, the disclosure requirements do not limit the choices of any particular group of voters. There is no reason to believe that those most sensitive to their privacy will be Republicans or Democrats, liberals or conservatives, blacks or whites. Scrutiny is inappropriate as long as the requirement leaves “a sufficient number of candidates eligible to represent the views of any particular constituency”, Developments in the Law—Elections, 88 Harv.L.Rev. 1111, 1218 (1975). As will be discussed in more detail below, this scheme does respond to important state interests in a reasonable way. Absent scrutiny, it is therefore constitutional. See Note, Fighting Conflicts of Interest in Officialdom: Constitutional and Practical Guidelines for State Financial Disclosure Laws, 73 Mich.L.Rev. 758, 763–68 (1975) [hereafter cited as Fighting Conflicts of Interest [11]].

### III.

Americans have a constitutional right to privacy. The right springs from several of the Bill of Rights amendments, and is incorporated in the due process protected by the fourteenth amendment.[12] *Griswold v. Connecticut*, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. Academic discussion of a right to privacy dates at least to the common law arguments of Louis Brandeis and Samuel Warren in 1890. Brandeis and Warren, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).[13] The volume of commentary has increased geometrically since then.[14] Yet, “[t]he concept of a constitutional right of privacy still remains largely undefined”. Kurland, The Private I, The University of Chicago Magazine 7, 8 (Autumn 1976), *quoted in Whalen v. Roe*, 1977, 429 U.S. 589, 599 nn.24, 97 S.Ct. 869, 51 L.Ed.2d 64. In *Whalen* the Court made

11. Another possibly relevant distinction between this case and cases where the Supreme Court invalidated restriction is that disclosure acts merely as a deterrent. Unlike filing fees or petition requirements, it does not force anyone off the ballot. In light of our conclusions concerning the impact of the restriction, this distinction is unimportant.

12. Some justices have seen privacy protected by the ninth amendment. *See Griswold v. Connecticut*, 1965, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (Justice Goldberg concurring, joined by Chief Justice Warren and Justice Brennan). This seems to be a distinction without a difference. “This right of privacy, *whether it be founded in* the Fourteenth Amendment’s concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment’s reservation of rights to people, is broad enough to encompass a woman’s decision whether or not to terminate her pregnancy.” [emphasis added]. *Roe v. Wade*, 1973, 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147.

13. Justice Brandeis has been quoted over a 38 year period by parties on both sides of this question. His 1890 article marshalled common law support for an expansive right to privacy. *But see* Pratt, The Warren and Brandeis Argu- ment for a Right to Privacy, 1975 Public Law. 161. Twenty-four years later, in a series of articles published during congressional consideration of what became of the Clayton Act, he advocated public disclosure of corporate financial arrangements in a passage which may have given this Amendment its name.

“Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.”
L. Brandeis, Other People’s Money and How the Bankers Use It 62 (1914). Fourteen years later, in *Olmstead v. United States*, he dissented from a decision approving wiretapping, characterizing privacy as “the right to be let alone—the most comprehensive of rights and the right most valued by civilized men”. *Olmstead v. United States*, 1928, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944.

14. A far from exhaustive list of the excellent articles and books in this area includes Gerety, Redefining Privacy, 12 Harv.Civ.R.–Civ.L.L. Rev. 233 (1977); Henkin, Privacy and Autonomy, 74 Colum.L.Rev. 1410 (1974); Bloustein, The First Amendment and Privacy: The Supreme Court Justice and the Philosopher, 28 Rutgers L.Rev. 41 (1974); A. Westin, Privacy and Freedom (1967); and, generally, XIII Nomos (1971).

an effort to unsnarl some of the tangled strands of privacy.

"The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions."

429 U.S. at 598–600, 97 S.Ct. at 876. The senators argue that the Sunshine Amendment violates both strands of their privacy. We shall consider first the interest in independent decision-making, which might be called an interest in autonomy, and then consider the interest in avoiding disclosure, or confidentiality.

### A.

■ The senators urge that disclosure of personal financial information adversely affects their familial affairs.

The nature of financial investments, their wisdom, worth or desirability are matters decided by family councils for the family's benefit. Whether they should be exposed or protected from exposure is a matter of great family concern. Media publication of disclosed wealth can bring mischief, even kidnappers or other criminal attention to an office holder. Financial privacy is and ought to be protected from governmental intrusion . . . in the manner that marital and family privacy is protected.

Plante complaint, ¶ 12, app. at 5.

The senators are well-advised to try to tie their charges to domestic matters. The Supreme Court has characterized the autonomy branch of privacy as involving

"matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these

areas it has been held that there are limitations on the States' power to substantively regulate conduct."

*Paul v. Davis*, 1976, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405. *See also Paris Adult Theatre I v. Slaton*, 1973, 413 U.S. 49, 65–66, 93 S.Ct. 2628, 37 L.Ed.2d 446. When the Supreme Court has applied this analysis, it has carefully examined the state actions to determine whether they were the least restrictive means to reach a compelling goal.[15] After doing so, it has voided regulations concerning contraception, *Griswold v. Connecticut*, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; abortion, *Roe v. Wade*, 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; and miscegenation, *Loving v. Virginia*, 1967, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010. It has also adopted, as reflecting this analysis, the holdings of earlier cases concerning education of children, *Pierce v. Society of Sisters*, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; *Meyer v. Nebraska*, 1923, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, and compulsory sterilization, *Skinner v. Oklahoma*, 1942, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655. *See Paris Adult Theatre I v. Slaton*, 413 U.S. at 65–66, 93 S.Ct. 2628; *Whalen v. Roe*, 429 U.S. at 600 n.26, 97 S.Ct. 869. Our question is whether the senators' argument fits within this field.

The parties suggest two different tests for determining whether their privacy interest is subject to this protection. They offer the formulation from *Meyer v. Nebraska*, 1923, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 that

"While this Court has not attempted to define with exactness the liberty thus guaranteed [by the fourteenth amendment] . . . [w]ithout doubt, it de-

---

**15.** These privacy cases seem to involve a fusion, or confusion, of equal protection and due process standards. Least restrictive alternative and compelling state interest analysis have been used both for the "upper tier" of equal protection claims, those involving fundamental interests or suspect classifications, and for some first amendment and privacy claims. Although due process and equal protection arguments often may be transformed into each other, and although the standard of review may be the same under either characterization, there is value in maintaining the conceptual distinction. *See Zablocki v. Redhail*, 1978, 434 U.S. 374, 391–396, 98 S.Ct. 673, 683–86, 54 L.Ed.2d 618, 634–37 (Justice Stewart, concurring in the judgment). Privacy challenges are brought not as requests for equal protection, but as demands for due process.

notes not merely the freedom from bodily restraint but also the right of the individual . . ., generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."

The defendants, and the district court, prefer the language the Court used in *Palko v. Connecticut*, 1937, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288, concerning rights "implicit in the concept of ordered liberty". Neither standard appears helpful. Both authorities are of questionable strength. *Meyer* comes to us from the heyday of substantive due process analysis. *Palko's* specific holding was overruled in *Benton v. Maryland*, 1969, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707. Its broader significance is as a statement of the ultimately unsuccessful position in the "incorporation debate" concerning the fourteenth amendment. *See Adamson v. California*, 1947, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (especially Frankfurter, J., concurring, and Black, J., dissenting) and *Duncan v. Louisiana*, 1968, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (Black, J., concurring). *See generally*, G. Gunther, Constitutional Law 506–47 (9th ed. 1975).[16] Even if these statements maintain their full precedential weight, their words provide no easy answers. Therefore, we turn to cases concerning financial privacy, and to the considerations which support the autonomy branch of the right to privacy.

The senators rely on language from Justice Powell's concurring opinion in *California Bankers Ass'n v. Shultz*, 1974, 416 U.S. 21, 78, 94 S.Ct. 1494, 39 L.Ed.2d 812. *California Bankers Ass'n* was a challenge to recordkeeping and disclosure requirements imposed by the Bank Secrecy Act of 1970, 12 U.S.C. §§ 1829b, 1730d, 1951–59. The Secretary of the Treasury was authorized to require banks to keep records of and report domestic and international transactions. The Court avoided most of the first and fifth amendment challenges to the Act, and concentrated on the fourth amendment arguments. Justice Powell, joined by Justice Blackmun, concurred in the opinion of the Court upholding the requirements. He was troubled, however, by the Act's domestic reporting requirements. These empowered the Secretary to require reports from financial institutions of domestic monetary transactions and the parties involved. Justice Powell concurred because the regulations promulgated by the Secretary required reporting only currency transactions of more than $10,000. He found the requirement unobjectionable, but only because it was narrowed by the regulations.

"A significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions for me. In their full reach, the reports apparently authorized by the open-ended language of the Act touch upon intimate areas of an individual's personal affairs. Financial transactions can reveal much about a person's activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy."

416 U.S. at 78–79, 94 S.Ct. at 1526.

This language was quoted with approval by the majority of the Court in *Buckley v. Valeo*, 1976, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659.

"Moreover, the invasion of *privacy of beliefs* may be as great when the information concerns the giving and spending of money *as when it concerns the joining of organizations*, for 'financial transactions can reveal much about a person's activities, associations, and beliefs'." [emphasis added]

424 U.S. at 66, 96 S.Ct. at 657. Justice Powell's discussion in *California Bankers* may have concerned privacy issues pure and simple. His mention of "intimate areas of an individual's personal affairs" suggests as much. The majority in *Buckley*, however, used that language in a different context.

---

**16.** *Palko* was quoted with approval, however, in *Roe v. Wade*, 1973, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147.

Both the language quoted above and the context from which it was taken show that the Court's concern was with the effects of disclosure on the first amendment freedom of association. The Court believed that the case potentially raised issues similar to those raised in *N.A.A.C.P. v. Alabama ex rel. Patterson*, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. That is a constitutional question we address below. It is not a question concerning the autonomy branch of the right to privacy. Although the Court has not explicitly rejected placing financial matters within the autonomy right, Justice Powell's *California Bankers* concurrence, as cited by the Court in *Buckley*, does not show that the Court has adopted that position.[17] The only other federal authority we have discovered rejected the applicability of the autonomy privacy right to financial information. *O'Brien v. DiGrazia*, 1 Cir. 1976, 544 F.2d 543.

The California Supreme Court came to the opposite conclusion. In *City of Carmel-by-the-Sea v. Young*, 1970, 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225, that Court invalidated a sweeping disclosure law that required *every* public officer to file financial statements covering himself and his family. The Court relied on an earlier California case, *People v. Edwards*, 1969, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713. In *Edwards* the Court held that the fourth amendment prohibited a search of outdoor trashcans because they were "adjunct[s] to the domestic economy", 80 Cal.Rptr. at 638, 458 P.2d at 718. In *Carmel* the Court held:

"[T]he right of privacy concerns one's feelings and one's own peace of mind . . . and certainly one's personal fi-

nancial affairs are an essential element of such peace of mind. Moreover, personal financial affairs are clearly more than the 'adjunct to the domestic economy' referred to in *Edwards* . . . instead they would appear to constitute the primary supporting pillar of that economy. In any event we are satisfied that the protection of one's personal financial affairs, and those of his (or her) spouse and children against compulsory public disclosure is an aspect of the zone of privacy which is protected . . . ."

85 Cal.Rptr. at 7, 466 P.2d at 231–32.

*City of Carmel* has been heavily criticized, both for its use of *Edwards* and for its conclusion.[18] Analysis of the roots of the autonomy branch of privacy convinces us that the critics are right.

There are two ways in which financial privacy could fall within the autonomy branch of the right to privacy. Financial privacy might itself involve the kind of crucial decision-making protected by the Constitution. Alternatively, financial disclosure might have such a strong impact on making familial decisions, those decisions which are clearly within the privacy right, that it must be prohibited to protect those choices.

Financial privacy does not fall within the autonomy right on its own. The essence of that right is "the interest in independence in making certain kinds of important decisions". *Walen v. Roe*, 429 U.S. 599–600, 97 S.Ct. 876. Disclosure laws, unlike laws banning contraception, miscegenation, or abortion, do not remove any alternatives from the decision-making process. Their effect

---

**17.** The dismissals for want of a substantial federal question in *Fritz v. Gorton, Stein v. Howlett,* and *Montgomery County v. Walsh,* seem to indicate the opposite. Justices Powell and Blackmun did not dissent from those dispositions, but they would have granted certiorari in the other case presenting these issues which has reached the Supreme Court, *Trooper's Lodge No. 41 v. Walker*, 1974, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 656. (Justice Douglas wrote a brief statement supporting the denial of certiorari on grounds other than those advanced by the parties or the lower court).

**18.** *See* Note, Fighting Conflicts of Interest, 73 Mich.L.Rev. 758 (1975); Note, 45 Tulane L.Rev. 167 (1970); Note, The Constitutionality of Financial Disclosure Laws, 59 Cornell 345 (1974); Staines, A Model Act for Controlling Public Corruption Through Financial Disclosure and Standards of Conduct, 51 Notre Dame Law. 636 (1976). The case was received less critically by Note, 49 Texas L.Rev. 346 (1971) and Comment, Financial Disclosure by Public Officials and Public Employees in Light of *Carmel-by-the-Sea v. Young*, 18 U.C.L.A.L.Rev. 534 (1971).

on financial decisions is more indirect. They might deter some decisions. More basically, however, disclosure laws do not involve decisions as important as those in the earlier decided cases.

Our society has long regulated people's finances. Interference with business activity, through licensing, taxing, and direct regulation, is common. All these governmental actions impinge on the ability of the individual to order his financial affairs. They do so directly. The indirect effects caused by financial disclosure pale by comparison. At one time "liberty of contract" was recognized as a major, if not the major, component of the liberty guaranteed by the fourteenth amendment. *See, e. g., Allgeyer v. Louisiana*, 1897, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832. *See generally* R. McCloskey, American Conservatism in the Age of Enterprise: 1865–1910, 72–126 (1951). That is no longer the case.

By contrast, the family-linked concerns protected by the autonomy branch of the right to privacy are also strongly protected in non-privacy contexts. In *Cleveland Board of Education v. LaFleur*, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52, the Court used irrebuttable presumption analysis to strike down mandatory maternity leaves for pregnant teachers. In *Zablocki v. Redhail*, 1978, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618, the Court invalidated a Wisconsin statute which prohibited marriage by certain residents without court permission. In *Boddie v. Connecticut*, 1971, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113, the Court held that indigents may obtain divorces without paying filing fees. The language of the opinion stresses the significance of marriage, a significance enhanced by the Court's later rejection of a similar argument aimed at bankruptcy filing fees. *United States v. Kras*, 1973, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626. In *Moore v. City of East Cleveland*, 1977, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531, four of the Justices stated that the family unit was entitled to constitutional protection as a matter of substantive due process. The family-related barriers erected by the right to privacy stem from legal protections for the fami-

ly and matters directly affecting the family, much broader than the legal protection accorded personal finances. These, in themselves, are not the kinds of decisions protected by the autonomy branch of the right to privacy.

Nor can they be protected as incident to protection of the family. The appropriate question is: What impact will financial disclosure have upon the way intimate family and personal decisions are made? Will it affect the decision whether to marry? Will it determine when or if children are born? There is no doubt that financial disclosure may affect a family, but the same can be said of any government action. While disclosure may have some influence on intimate decision-making, we conclude that any influence does not rise to the level of a constitutional problem.

The Court has limited the horizontal reach of the privacy right in similar situations. In *Whalen v. Roe*, 1977, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64, the Court assumed that protection of the autonomy right could extend to decisions concerning medical care. It recognized that the state law requiring that records be kept concerning some drug prescriptions had discouraged the use of those drugs. 429 U.S. at 603, 97 S.Ct. 869. This was held to have insufficient effects on the patients' decisions to constitute an invasion of the patients' rights. Similarly, in *Planned Parenthood of Central Missouri v. Danforth*, 1976, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788, the Court upheld record-keeping requirements for abortions over an objection that this would be governmental interference with the woman's choice. Finally, in *Poelker v. Doe*, 1977, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528; *Maher v. Roe*, 1977, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484, and *Beal v. Doe*, 1977, 432 U.S. 439, 97 S.Ct. 2366, 53 L.Ed.2d 464, the Court held that neither states participating in the medicaid program nor cities operating municipal hospitals need provide free abortions to indigent women. Although the cost of an abor-

tion operates as a much stronger influence on the choice involved than does financial disclosure in this case, the Court held that government actions which did not work as a bar to abortions would not be subject to scrutiny. *Maher v. Roe*, 432 U.S. at 471–75, 97 S.Ct. 2381–83, 53 L.Ed.2d 493–95. If such strong secondary effects on family do not demand scrutiny, this financial disclosure law cannot require a close examination because of its impact on the family.[19]

Financial privacy is not within the autonomy branch of the right to privacy. Disclosure does not directly affect such fundamental decisions that "we are deprived of control over such intimacies of our bodies and minds as to offend what are ultimately shared standards of autonomy". Gerety, Redefining Privacy, 12 Harv.Civ.R.-Civ.L.L. Rev. 233, 268 (1977). Nor is its indirect effect on intimate decisions as strong as some which the Court has held do not invoke strong constitutional protection. The district court properly concluded that the senators cannot bring their complaint within this branch of the right to privacy.

### B.

There is another strand to the right to privacy properly called the right to confidentiality. *See* Gerety, Redefining Privacy, 12 Har.Civ.R.Civ.L.Rev. 233 (1977). The Supreme Court has defined this branch as "the individual interest in avoiding disclosure of personal matters". *Whalen v. Roe*, 429 U.S. at 599, 97 S.Ct. at 876.

In the constitutional arguments we have considered thus far, the senators failed because their complaints were not within the scope of the rights involved. Their conten-

tions do fall directly within this right. Our problem in this section is to determine the proper standard of review of their claims, then apply it. The answer is not easy.

This case is not analogous to cases requiring disclosure of organizational membership. *See N. A. A. C. P. v. Alabama ex rel. Patterson*, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; *Shelton v. Tucker*, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; *Bates v. City of Little Rock*, 1960, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; *Louisiana ex rel. Gremillion v. N. A. A. C. P.*, 1961, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301. Those cases prevented states from requiring disclosure of membership in the N.A.A.C.P., either through requiring that individuals disclose their membership, *Bates v. City of Little Rock*, or that the organization disclose its members. In those times and places the attempted restraint on the freedom of association was patent. Similarly, *Buckley v. Valeo*, 1976, 424 U.S. 1, 60–84, 96 S.Ct. 612, 46 L.Ed.2d 659, discussed campaign contributor disclosure in the context of "privacy of *association and belief* guaranteed by the First Amendment". [emphasis added] 424 U.S. at 29, 96 S.Ct. at 640. *Cf. Talley v. California*, 1960, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (striking down ordinance prohibiting anonymous pamphlets). Such disclosure requirements, because they strike at first amendment freedoms, "must survive exacting scrutiny". *Buckley*, 424 U.S. at 64, 96 S.Ct. 612.

■ Here, memberships, associations, and beliefs are revealed, if at all, only tangentially. The Amendment calls for disclosure of assets, debts, and sources of income, each to be identified and valued. Although in some particular situations, rigorous applica-

---

19. A similar distinction between direct and indirect impacts on the family was made by the Court in *Zablocki v. Redhail*, 1978, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618, 631 n.12. *Zablocki* directly forbade certain marriages. In *Califano v. Jobst*, 1977, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228, the Court upheld sections of the Social Security Act which terminated benefits upon marriage to an individual not entitled to benefits under that Act in the face of argu-

ments that this restricted the right to marry. Justice Marshall, for the Court, found the difference in the "directness and substantiality of the interference", 434 U.S. 374, 98 S.Ct. 673, 681, 54 L.Ed.2d 618, 631 n.12. In *Jobst*, there was "no evidence that the laws significantly discouraged, let alone made 'practically impossible', any marriages." *Id.* Justice Rehnquist, dissenting, in *Zablocki*, felt that *Jobst* was not distinguishable.

tion of the Amendment might implicate first amendment freedoms, when considering the Amendment on its face this threat is too remote to raise the issue.[20]

The Supreme Court has twice explicitly considered the confidentiality strand of privacy. In *Whalen v. Roe*, 1977, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64, the challenge to New York's prescription reporting requirement was based on both branches of privacy analysis. The Court did not discuss the standard to be applied to public disclosure, because it determined that the chance of such disclosure occurring was minimal. Legally, such information could be used only in judicial proceedings. The state made unauthorized disclosure a crime punishable by up to a year in prison and a $2,000 fine. The Court discussed in some detail the extensive security surrounding the data. 429 U.S. at 593–95, 97 S.Ct. 869. The possibility of ineffective judicial protection of information used in criminal proceedings was held to be too remote to lead to invalidation of the program. The Court then distinguished the disclosure to employees of the state, who are under a duty to keep it confidential, from disclosure to the public. Such disclosure was held to raise no more substantial constitutional question than many widely accepted reporting requirements. 429 U.S. at 602, 97 S.Ct. 869. Because it determined that *public* disclosure was unlikely, the Court did not address the standard to be applied to such public disclosure.

The other Supreme Court decision concerning this right is *Nixon v. Administrator of General Services*, 1977, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867. The *Nixon* case arose as a result of the Presidential Record-

ings and Materials Preservation Act, Pub.L. 93–526, Title I, note following 44 U.S.C. § 2107. The Act purported to cover the disposition of the 42 million pages of material and 880 tape recordings accumulated by ex-president Nixon. The Act, as implemented by the Administrator's regulations, provided that professional archivists would examine all the materials and cull all personal material from the documents. The Court pointed out that screening was essential to assure the public that all the public documents were in fact retained and preserved. Although recognizing that Nixon had a legitimate expectation of privacy in at least some of the materials, the Court balanced the interests involved and upheld the law. The public interest was important; the screening essential; the government archivists "unblemished"; and the intrusion limited. 433 U.S. at 455–65, 97 S.Ct. at 2796–2802, 53 L.Ed.2d at 899–905.

*Nixon* does not resolve our problem. The case involved not public disclosure but viewing and screening of public and private documents by archivists. The material which the Court and Nixon worried about included "extremely private communications between [him] and, among others, his wife, his daughters, his physician, lawyer and clergyman, and his close friends as well as personal diary dictabelts and his wife's personal files". 433 U.S. at 459, 97 S.Ct. at 2798, 53 L.Ed.2d at 901. The Court did not speak in usual terms of standard of review. The Court found the Act's invasion of President Nixon's privacy potentially troubling, but "balanced" the interests and termed the Act "reasonable". It also stressed that there were *no* alternatives to some screening.[21]

---

**20.** Without implying any views on the merits of a suit which properly raised the issue, we feel a substantial constitutional issue might be raised by disclosure of one's income tax returns. Such disclosure could be troublesome if it were to reveal the nature of various contributions made by the official or candidate, such as contributions to a church, a political party, or a charity. Regulations by the Commission on Ethics might, of course, eliminate any threat of

such sensitive revelations. The issue must await another case.

**21.** In *Nixon v. Warner Communications, Inc.*, April 18, 1978, —— U.S. ——, 98 S.Ct. 1306, 55 L.Ed.2d 570, the Supreme Court held that tape recordings used as evidence in the trial of several Watergate defendants need not be released to the public. The decision did not include any discussion of anyone's right to privacy.

■ The Supreme Court has provided little specific guidance.[22] Although in the autonomy strand of the right to privacy, something approaching equal protection "strict scrutiny" analysis has appeared, we believe that the balancing test, more common to due process claims, is appropriate here. The constitutionality of the amendment will be determined by comparing the interests it serves with those it hinders.[23]

The balancing standard seems appropriate. In equal protection cases the Supreme Court has warned against giving heightened attention to cases involving new "fundamental interests". *San Antonio Independent School District v. Rodriguez*, 1973, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16. The Court has avoided proclaiming such a standard in the two cases raising the issue in which it issued opinions, *Whalen v. Roe* and *Nixon v. Administrator of General Services*. It has dismissed for want of a substantial federal question three cases raising the question in financial disclosure contexts. *Montgomery Co. v. Walsh*, 1975, 274 Md. 502, 336 A.2d 97, *app. dism'd*, 1976, 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306; *Fritz v. Gorton*, 1974, 83 Wash.2d 275, 517 P.2d 911, *app. dism'd*, 1974, 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208; *Stein v. Howlett*, 1972, 52 Ill.2d 570, 289 N.E.2d 409, *app. dism'd*, 1973, 412 U.S. 925, 93 S.Ct. 2750, 37 L.Ed.2d 152; *see* discussion above at 5–7. Subjecting financial disclosure laws to the same scrutiny accorded laws impinging on autonomy rights, such as marriage, contraception, and · abortion, would draw into question many common forms of regulation, involving disclosure to the public and disclosure to government bodies.[24]

■ At the same time, scrutiny is necessary. The Supreme Court has clearly recognized that the privacy of one's personal affairs is protected by the Constitution. Something more than mere rationality must be demonstrated. Otherwise, public disclosure requirements such as Florida's could be extended to anyone, in any situation.[25]

The district court found that four important state concerns are significantly advanced by the Amendment: the public's "right to know" an official's interests, deterrence of corruption and conflicting interests, creation of public confidence in Florida's officials, and assistance in detecting and prosecuting officials who have violated the law. The importance of these goals cannot be denied. The question is whether the Sunshine Amendment significantly promotes them.

What the district court called the public's "right to know" is promoted by the Amendment. This phrase, however, is misleading.

22. Except, of course, through the dismissals for want of substantial federal questions noted above.

23. This may be consistent with the standard of review used in the "autonomy" branch of privacy cases. Rather than consider "compelling state interests" a label for immunizing circumstances, it might reflect merely the great weight on the state's end of the traditional balancing test.

24. The government requires many kinds of financial disclosure from its citizens. The federal income tax is the best known. Although the 1040 form is not well-loved, it is widely accepted both by the general public and as a matter of constitutional law. *Cf. United States v. Sullivan*, 1927, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, upholding a conviction for failure to file an income tax return against a Fifth Amendment claim. Social Security tax law requires employers to tell the federal government the names, addresses, and compensation of all their employees. Some public disclosure is re-

quired by the securities laws and regulations thereunder. *E. g.*, Securities Act of 1933, § 10(a)(1) and Schedule A(4), (14), 15 U.S.C. §§ 77j(a)(1), 77aa(4), (14), requiring disclosure of names, addresses, and remuneration of directors and officers in the prospectus; Securities Exchange Act of 1934, § 16(a), 15 U.S.C. § 78p(a), requiring insiders to disclose the amount and monthly changes in the amount of their direct and indirect holdings of their company's stock.

25. In this context it is interesting that the two state courts that did strike down disclosure laws for privacy reasons struck down laws that applied to local employees and minor officials as well as high state officials. The Michigan Court expressly found the statute sufficiently narrow for some high officials. *City of Carmel-by-the-Sea v. Young*, 1970, 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225; Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2–10), 1976, 396 Mich. 465, 242 N.W.2d 3.

Disclosure is helpful not because it fulfills an independent "right", but because it makes voters better able to judge their elected officials and candidates for those positions. All of the officials covered by the Amendment are elected. It is relevant to the voters to know what financial interests the candidates have. As the Supreme Court said, in discussing campaign contributions, the knowledge will "alert the voter to the interests to which a[n official] is most likely to be responsive". *Buckley v. Valeo*, 424 U.S. at 67, 96 S.Ct. at 657.

The senators contend that the Amendment will not stop corruption. They make the reasonable point that few officials are likely to make a public disclosure of illegal income. Yet, the existence of the reporting requirement will discourage corruption. Sunshine will make detection more likely. The interest in an honest administration is so strong that even small advances are important.

The Amendment will not overnight restore (or create) public confidence in Florida's government. Although the events of recent years may have strengthened the Sunshine Amendment, cynicism about public officials is not a new, and easily reversed, phenomenon. Disclosure may not completely remove this doubt. It should help, however. And more effective methods are not obvious.

The fourth interest discussed by the district court, aiding detection and prosecution of violations, seems less affected by the Amendment than the others. While misdeeds may be deterred by the need to file either honest or perjurious financial statements, once they have been committed, the statements may well be useless.

The Supreme Court has considered the first, second, and fourth goals in the context of campaign contribution disclosure. The Court held them strong enough to outweigh any infringement on first amendment rights caused by the Act. *Buckley v. Valeo*, 424 U.S. at 66–68, 96 S.Ct. 612. The Supreme Court of Florida, in upholding the legislative percursor of this amendment, found that "Florida has a compelling inter-

est in protecting its citizens from abuse of the trust placed in their elected officials". *Goldtrap v. Askew*, Fla.1976, 334 So.2d 20, 22.

Ranged against these important interests are the senators' interests in financial privacy. Their interest is substantial. For better or for worse, money too makes the world go round. Financial privacy is important not only for the reasons the California Supreme Court accepted: the threat of kidnapping, the irritation of solicitations, the embarrassment of poverty. *City of Carmel-by-the-Sea v. Young*, 1970, 2 Cal.3d 259, 85 Cal.Rptr. 1, 9, 466 P.2d 225, 233. When a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages. Privacy of personal matters is an interest in and of itself, protected constitutionally, as discussed above, and at common law. *See, e. g., Santiesteban v. Goodyear Tire & Rubber Co.*, 5 Cir. 1962, 306 F.2d 9 (malicious repossession of goods in public may state privacy claim).

The extent of the interest is not independent of the circumstances. Plaintiffs in this case are not ordinary citizens, but state senators, people who have chosen to run for office. That does not strip them of all constitutional protection. *Nixon v. Administrator of General Services*, 433 U.S. 425 at 457, 97 S.Ct. 2777 at 2797, 53 L.Ed.2d 867 at 900. It does put some limits on the privacy they may reasonably expect. The first amendment puts much greater restrictions on libel and slander actions by public officials or public figures than similar actions by private parties. *New York Times v. Sullivan*, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, established that public official must show "actual malice" to recover for libel. A public official, for purposes of the *New York Times* test, includes elected officials and candidates for those positions, appointed officials, and employees "who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs". *Rosenblatt v. Baer*, 1966, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597. By compari-

son, private parties need only show fault of some kind to recover actual damages. *See Gertz v. Robert Welch, Inc.*, 1974, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789; *Time, Inc. v. Firestone*, 1976, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154. Even in financial matters, public officials usually have less privacy than their private counterparts. The salaries of most officials, including federal judges, are matters of public record.

■ Financial privacy is a matter of serious concern, deserving strong protection. The public interests supporting public disclosure for these elected officials are even stronger. We join the majority of courts considering the matter and conclude that mandatory financial disclosure for elected officials is constitutional.[26]

That does not end our inquiry. The senators focus their contentions on three specific features of the Amendment: the requirement that values be assigned to assets, the requirement that secondary sources of income be disclosed, and the publication of their financial statements. Each of these features must be individually examined, its incremental benefits balanced against the added violation of the officials' privacy.

■ The senators cite language from state court opinions which approve schemes using dollar ranges rather than exact figures.[27] They argue that all of the benefits of the statute could be obtained by requiring only ranges of value, rather than demanding specific figures. Their argument is unconvincing. While sufficiently narrow ranges would convey much useful information, increasing the specificity will increase the value of the information.[28] Acknowledging an asset worth $13,217 is little more an invasion of privacy than stating that the asset is worth between $10,000 and $15,000. While the incremental benefit may be slight, the incremental harm is even slighter.

■ The Amendment states that the rules governing the financial statement shall require "disclosure of secondary sources of income". The Amendment offers an alternative to any statement of

**26.** *See Fritz v. Gorton*, 1974, 83 Wash.2d 275, 517 P.2d 911, *app. dism'd*, 1974, 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208; *Stein v. Howlett*, 1972, 52 Ill.2d 570, 289 N.E.2d 409, *app. dism'd*, 1973, 412 U.S. 925, 93 S.Ct. 2750, 37 L.Ed.2d 152; *Montgomery County v. Walsh*, 1975, 274 Md. 502, 336 A.2d 97, *app. dism'd*, 1976, 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306; *County of Nevada v. MacMillen*, 1974, 11 Cal.3d 662, 114 Cal.Rptr. 345, 522 P.2d 1345; *Evans v. Carey*, 1976, 53 A.D.2d 109, 385 N.Y.S.2d 965, *aff'd*, 1977, 40 N.Y.2d 1008, 391 N.Y.S.2d 393, 359 N.E.2d 983; *Goldtrap v. Askew*, Fla.1976, 334 So.2d 20; *Illinois State Employees Ass'n v. Walker*, 1974, 57 Ill.2d 512, 315 N.E.2d 9, *cert. den. sub nom. Troopers Lodge No. 41 v. Walker*, 1974, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 656; *In re Kading*, 1976, 70 Wis.2d 508, 235 N.W.2d 409; *Klaus v. Minnesota Ethics Comm'n*, 1976, 309 Minn. 430, 244 N.W.2d 672; *Kenny v. Byrne*, App.Div.1976, 144 N.J.Super. 243, 365 A.2d 211.

**27.** *See County of Nevada v. MacMillen*, 1974, 11 Cal.3d 662, 114 Cal.Rptr. 345, 350, 522 P.2d 1345, 1350 ("Moreover, unlike the 1969 act, the 1973 act does not require disclosure of the actual extent of the official's assets and interests, but only whether the value of his investment or real property interest exceeds $10,000 . . . ."); *In re Kading*, 1976, 70 Wis.2d 508, 235 N.W.2d 409, 418 ("Most importantly, neither the dollar value nor the quantity of the assets need be disclosed."); *Klaus v. Minnesota State Ethics Comm'n*, 1976, 309 Minn. 430, 244 N.W.2d 672, 676 ("Nothing in our statute requires a candidate to disclose his net worth or the amount of his income, information which is traditionally personal and privileged.").

**28.** The Illinois Supreme Court quoted the trial judge to make this point in *Illinois State Employees Ass'n v. Walker*, 1974, 57 Ill.2d 512, 315 N.E.2d 9, *cert. den. sub nom. Troopers Lodge No. 41 v. Walker*, 1974, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 656:

"While full financial disclosure is burdensome, anything less would be ineffective in accomplishing the goal. The disclosure of only the sources of significant business interests and substantial amounts of income, as under the Ethics Act [Ill.Rev.Stat.1973, ch. 127, par. 601 et seq.], is useful as far as it goes, but the information exempted is such that much corruption may go undetected. It is misleading, and ultimately undermining of public confidence, to institute a disclosure program having exemptions as broad as the coverage. *The inclusion of dollar amounts is justified because it allows for detection of many more types of unethical conduct.*" [emphasis added]

315 N.E.2d at 17.

income sources: the official may file a copy of his federal income tax return. The secondary source requirement is effective only if the official chooses not to do so. The meaning of "secondary source" is unclear. The senators' brief suggests the Amendment demands that "names of patients and clients who pay for non-governmental services from these part-time public officers be revealed". Appellants' brief at 23. In oral argument the State maintained that this depended on the nature of the officer's employer. A lawyer-legislator working for a law firm could list income source as the law firm; a sole practitioner would have to list all clients who paid more than $1,000 in fees.

The interest of the State in knowing who provided an official with income is clear. This argument is troubling only because rights of third parties intrude. A doctor's patients or a lawyer's clients may have confidential relationships protected by state law; customers and clients of other fields may also be entitled to some sort of protection. At least two state courts have considered this problem. The Missouri Supreme Court upheld a requirement that lawyers reveal for publication the names of their clients and the fees received from them. The Court found that the attorney-client privilege was not a barrier to the law. It pointed out that declaratory judgment actions could be brought on a case by case basis for exemptions from this requirement. *Chamberlin v. Missouri Elections Commission*, Mo.1976, 540 S.W.2d 876. The Alaska Supreme Court came to the opposite conclusion in a suit brought by a doctor. The doctor challenged the disclosure requirement by asserting the privacy rights of his patients. The Court allowed this assertion of a third party's rights, and held that rules would be necessary to provide for some exemptions from the requirement. The Court was not troubled by disclosure in most cases, but felt that some visits would demand confidentiality, as when the doctor was a psychiatrist specializing in treating sexual problems. *Falcon v. Alaska Public Offices Commission*, Alaska 1977, 570 P.2d 469.

No clients or patients are parties to this suit. The senators have not tried to assert the interests of their clients or customers. The shape of the secondary source requirement is unclear. If precise regulations on this matter have been promulgated by the Florida Commission on Ethics, we have not found them. Commission regulations might allow exemptions in sensitive situations. The Amendment provides an option, the federal tax return, which eliminates any need to itemize income sources. On the record before us, we cannot invalidate this feature of the Amendment. We intimate no opinion as to the outcome of a challenge to the application of the secondary source requirement in some specific situation.

█ The senators' final complaint is that the State's interests would be served just as well by limiting disclosure to the Florida Commission on Ethics. This could deter some corruption, restore some public confidence, and detect some malfeasance. But the Florida voters have decided that it could not provide the voting public with the valuable information public disclosure creates; something more is needed. This educational feature of the Amendment serves one of the most legitimate of state interests: it improves the electoral process. That goal, recognized as important by the Supreme Court in *Buckley*, can be met in no other way. That goal justifies public publication of the senators' financial statements.

IV.

We have reviewed the senators' constitutional arguments. The district court dismissed their complaints for failure to state a claim upon which relief could be granted. In *Conley v. Gibson*, 1957, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, the Supreme Court held:

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

This case meets that test. To be sure, difficult questions are presented by the sen-

ators, but they are questions of law, not of fact. Our deliberations have led us to conclude that no law exists to support the senators' complaint.

We are not insensitive to the senators' dilemma; nor do we doubt the sincerity of their opposition to the Amendment. Their privacy, and the privacy of the others included in the Amendment, is severely limited by it. We do not say that it is wise: the people of Florida, by a four to one vote, have done that. We do say that, on its face, it is constitutional. The judgment of the district court is

AFFIRMED.

## APPENDIX A

§ 112.3145

(2) (a) A person seeking nomination or election to a state or local elective office shall file a statement of financial interests together with, and at the same time he files, his qualifying papers.

(b) Each state or local officer and each specified employee shall file a statement of financial interests no later than 12 o'clock noon of July 15 of each year, including the July 15th following the last year he is in office. Each state or local officer who is appointed and each specified employee who is employed shall file a statement of financial interests within 30 days from the date of appointment or, in the case of specified employees, from the date on which the employment begins, except that any person whose appointment is subject to confirmation by the Senate shall file prior to confirmation hearings or within 30 days from the date of appointment, whichever comes first.

(c) State officers and specified employees shall file their statements of financial interests with the Secretary of State. Local officers shall file their statements of financial interests with the Clerk of the Circuit Court of the county in which they are principally employed or are residents. Persons seeking to qualify as candidates for public office shall file their statements of financial interests with the officer before whom they qualify.

(3) The statement of financial interests for state officers, specified employees, local officers, and persons seeking to qualify as candidates for state or local office shall be filed even if the reporting person holds no financial interests requiring disclosure, in which case the statement shall be marked "not applicable". Otherwise, the statement of financial interests shall include:

(a) All sources of income in excess of 5 percent of the gross income received during the disclosure period by the person in his own name or by any other person for his use or benefit, excluding public salary. However, this shall not be construed to require disclosure of a business partner's sources of income. The person reporting shall list such sources in descending order of value with the largest source first.

(b) All sources of income to a business entity in excess of 10 percent of the gross income of a business entity in which the reporting person held a material interest and from which he received an amount which was in excess of 10 percent of his gross income during the disclosure period and which exceeds $1,500. The period for computing the gross income of the business entity is the fiscal year of the business entity which ended on, or immediately prior to, the end of the disclosure period of the person reporting.

(c) The location and description of real property in this state, except for residences and vacation homes, owned directly or indirectly by the person reporting, when such person owns in excess of 5 percent of the value of such real property, and the general description of any intangible personal property worth in excess of 10 percent of the person's total assets. For the purposes of this paragraph indirect ownership shall not include ownerships by a spouse or minor child.

(d) A list of all persons, business entities, or other organizations, and the address and a description of the principal business activity of each, from whom he received a gift or gifts from one source, the total of which exceeds $100 in value during

the disclosure period. The person reporting shall list such benefactors in descending order of value with the largest listed first. Gifts received from a parent, grandparent, sibling child, or spouse of the person reporting, or from a spouse of any of the foregoing; gifts received by bequest or devise; gifts disclosed pursuant to s. 111.011; or campaign contributions which were reported as required by law need not be listed. For purposes of this paragraph a debt on which a preferential rate of interest substantially below the rate charged under the then customary and usual circumstances is charged shall be deemed a gift of an amount equal to the amount represented by the difference between the preferential and customary rate charged on the debt.

(e) Every debt which in sum equals more than the reporting person's net worth.

### APPENDIX B

The Amendment has several different provisions. Disclosure of campaign finances is required by subsection (b). Subsection (c) makes employees or officials who breach their trust, and persons who induce the breach, liable to the state for the amount of damages. Conviction of a felony involving breach of public trust forfeits the official's pension rights, according to subsection (d). Subsection (e) provides that covered officials may not represent others before boards on which they sat for two years following the end of their term. Legislators may represent clients during their term of office only before judicial tribunals. Subsection (f) establishes an independent commission to investigate and report alleged abuses. This commission. is later identified as the Florida Commission on Ethics, established by the 1974 legislation.

The full text, as relevant to financial disclosure, follows.

Ethics in Government.—

A public office is a public trust. The people shall have the right to secure and sustain that trust against abuse. To assure this right: ·

(a) All elected constitutional officers and candidates for such offices and, as may be determined by law, other public officers, candidates, and employees shall file full and public disclosure of their financial interests.

.     .     .     .     .

(g) This section shall not be construed to limit disclosures and prohibitions which may be established by law to preserve the public trust and avoid conflicts between public duties and private interests.

(h) Schedule—On the effective date of this amendment and until changed by law:

(1) Full and public disclosure of financial interests shall mean filing with the secretary of state by July 1 of each year a sworn statement showing net worth and identifying each asset and liability in excess of $1,000 and its value together with one of the following:

a. A copy of the person's most recent federal income tax return; or

b. A sworn statement which identifies each separate source and amount of income which exceeds $1,000. The forms for such source disclosure and the rules under which they are to be filed shall be prescribed by the independent commission established in subsection (f), and such rules shall include disclosure of secondary sources of income.

(2) Persons holding statewide elective offices shall also file disclosure of their financial interests pursuant to subsection (h)(1).

(3) The independent commission provided for in subsection (f) shall mean the Florida Commission on Ethics.